[No. 37067. En Banc. May 7, 1964.]

THE STATE OF WASHINGTON, *on the Relation of Verne Frese et al., Appellant,* v. THE CITY OF NORMANDY PARK *et al., Respondents.*\*

\*Reported in 392 P. (2d) 207.

*McMullen & Prince,* by *George N. Prince,* for appellant.

*Williams, Cole & Kinnear, Kenneth A. Cole,* and *Stanley B. Allper,* for respondents.

DONWORTH, J.—Appellants are three residents of the City of Normandy Park (and their wives) who are seeking a reversal of the trial court's denial of their petition for a writ of mandamus or prohibition which they filed to prevent the city from carrying out a proposed project for the collection, treatment, and disposal of sewage, pursuant to a contract with the Southwest Suburban Sewer District (executed by the two municipal corporations on May 29, 1962), relating to part of an area known as the Miller Creek Drainage Basin.[1] Respondents are the mayor and councilmen of the city who approved the execution of the contract with the Sewer District and enacted ordinance No. 130 establishing Local Improvement District No. 62-SS-1 to facilitate the construction of a sewer system within the city. Appellants also sought to have the existence of the Local Improvement District declared illegal and void.

For convenience, the City of Normandy Park will be referred to as the City; the Southwest Suburban Sewer District will be referred to as the Sewer District; and Local Improvement District No. 62-SS-1 will be referred to as the LID.

After a careful review of the record, we are unable to state the essential facts of the case more succinctly than was done in the trial court's findings of fact. Therefore, we quote findings Nos. 3 to 13, inclusive, which are as follows:

"III. During a period of more than the past fifteen years, residential development in the area, lying south of the City of Seattle, including and surrounding what is presently the City of Normandy Park, has given rise to sanitation problems and to various movements to provide a public sanitary sewage system in an area, partially encompassing Normandy

---

[1]The area involved is pictured in the map accompanying this opinion and has been reproduced from respondents' brief on appeal with minor changes by the court to permit black and white printing.

Park, known as Miller Creek Drainage Basin [a natural drainage area]. . . . As a result of increasing residential development, Miller Creek, which flows through Normandy Park, and tributaries thereto, and the roadside ditches within the City of Normandy Park became polluted. Attempts of the Southwest Suburban Sewer District to

serve the southerly and westerly portion of Miller Creek Drainage Basin, including Normandy Park, had been impeded by objections and actions of residents (resulting in the incorporation of Normandy Park in 1953), who feared location of the treatment plant on Lot A, a platted recreation area privately owned in common by the owners of lots in Normandy Park. An attempt to provide sewerage service to the City of Normandy Park by annexation to the Southwest Suburban Sewer District failed to carry in an annexation election held in January 1960.

"IV. In May 1960, the City of Normandy Park employed a firm of consulting engineers to conduct a preliminary study of the topography, existing facilities, sanitary conditions of the city and Miller Creek, to review previous investigations of the sanitation problem, establish criteria for design of collection and treatment facilities, compare methods and costs of providing necessary facilities, and for the development of a plan for providing or constructing sewerage facilities to the City of Normandy Park based on those technical and economic studies, and to make a report thereon. Said report was made to the council of the City of Normandy Park in May 1961.

"V. The Normandy Park city council studied the engineering report and held numerous council discussions thereon as well as holding public hearings for the purpose of informing the public and property owners of the problems and alternative solutions, and of the relative costs thereof. The city council conducted meetings and negotiations with the commissioners of the Southwest Suburban Sewer District relating to the possibility of joint construction and use of facilities.

"VI. On May 10, 1962, the respondents adopted Resolution No. 87 of the council of the City of Normandy Park, declaring the intention of the City of Normandy Park to form a local improvement district to be known as LID No. 62-SS-1. Due notice of the hearing upon said resolution was given by publication and by mail to the owners and reputed owners of all lots, tracts, and parcels of land to be benefited by the proposed local improvement. The engineers, engaged by the city, prepared preliminary estimates, maps and a preliminary assessment roll of the amount of the estimated cost and expense of the proposed improvement to be assessed against the property within the improvement district, held public meetings, investigated the facts relating to need, cost and benefits, and made determinations on total

assessments outstanding against the property benefited within the local improvement district, considered the actual value of the real property, together with improvements thereon lying within the proposed local improvement district, answered questions and considered objections raised by property owners at the hearing on the proposed creation of the local improvement district.

"VII. On May 29, 1962, the city council entered into a contract (Exhibit 4) with the Southwest Suburban Sewer District, which provided for (1) the installation of a collection system within the City of Normandy Park by the city and (2) for the construction, ownership and operation of a sewer treatment plant and outfall within the city by the Southwest Suburban Sewer District, and (3) for joint use of the sewer treatment plant by users of property within the city and by the sewer district inhabitants, and (4) for the payment, by the sewer district, of any costs for the construction of mains in excess of the city's need, and (5) providing for an initial capacity in the treatment plant for 1,000 residential or equivalent units from the city and for expansion of the treatment plant to serve future needs of the city and the sewer district's inhabitants under a financing plan which would result in sewer service charges substantially below those costs which would result from installing a collection system and treatment plant by the city for the exclusive use of the city's inhabitants.

"VIII. Said contract contains no provision requiring the City of Normandy Park to install any sewer lines or trunks in excess of the requirements of the local improvement district nor does the contract require installation, by either party, of collection systems or trunks or sewer disposal facilities to serve any area of Miller Creek Drainage Basin or other territory outside the corporate limits of the city or the sewer district, although the contract agrees to permit the sewer district to serve such outside area by sewer lines running within the city and the sewer district agrees that it will pay for the cost of any sewer trunks installed beyond the needs of the city (if any), and that the treatment plant to be built by the Southwest Suburban Sewer District could be expanded to serve such outside area in the future. Said contract contains no provision which would obligate the property owners within LID 62-SS-1 or the City of Normandy Park to pay, by assessments or by monthly sewer service charges, for the capital cost of installing or acquiring collection or trunk sewer mains, treatment facilities and

outfall lines or the cost of maintenance and operation of the same for property or users lying outside the area of LID 62-SS-1 nor the cost of installing sewer mains of a capacity beyond the reasonable foreseeable requirements of the local improvement district properties.

"IX. Following the public hearing on June 13, 1962, upon the resolution of intention to create Local Improvement District No. 62-SS-1, the city council of Normandy Park, on June 14, 1962, adopted Ordinance No. 130, establishing the local improvement district known as LID No. 62-SS-1, embracing the land within the City of Normandy Park described in the ordinance which the respondent city council reasonably determined, included, as nearly as practicable, all of the property to be specially benefited by the collection system and trunk improvement.

"X. The respondent city councilmen reasonably determined that the proposed system of trunk sewers within Local Improvement District No. 62-SS-1 includes, as nearly as possible, all of the territory which can be drained through the trunk sewers and subsewers connected thereto. Respondents further reasonably determined that the only remaining areas, within the City of Normandy Park not to be served by the mains in LID No. 62-SS-1, could be more economically and readily served by another system of collection sewers and trunk, and that the attempted inclusion of the remaining areas, excluded from the LID No. 62-SS-1, would result in increased assessments and sewer service charges to the property owners and users within LID No. 62-SS-1 as well as to the property owners and users in the excluded area.

"XI. The respondents' plan for assessing the property specially benefited by the improvement and the sewer service fees to be charged within the LID No. 62-SS-1 will not require the property owners and users within LID No. 62-SS-1 to pay any portion of the cost of trunk sewers which may be installed therein in excess of the present or foreseeable future requirements of the land within the local improvement district.

"XII. The City of Normandy Park is presently levying an ad valorem tax of 15 mills on the dollar of assessed valuation of property within the city. No levy in excess thereof has been made or attempted by the respondents and no election has been called for the authorization of excess levies as required by RCW 84.52.050 and the 17th amendment of the state constitution.

"XIII. The City of Normandy Park plans to proceed with the proposed improvement, has authorized the preparation of further plans, specifications, maps, drawings and designs for the proposed sanitary sewage collection system of laterals and mains, etc. and proposes to pay approximately $900,-000 of the cost of such improvement by assessment against property specially benefited within the local improvement district."

Appellants have assigned error only to parts of findings Nos. 6 and 10. These challenged parts are supported by substantial evidence, so we must take all the findings as stating the established facts of the case.

Based on its findings of fact, the trial court entered the following conclusions of law:

"I. The City of Normandy Park and its council have the power to initiate LID No. 62-SS-1 by resolution. Ordinance No. 130 of the Normandy Park city council was regularly adopted and the respondents have complied with all statutory procedural requirements preliminary to the establishment of said local improvement district.

"II. The City of Normandy Park and its council have the power to enter into the contract dated May 29, 1962 with the Southwest Suburban Sewer District, as authorized by Resolution No. 88 of the city council; and have acted reasonably and with due consideration of the public health, safety and welfare in providing for the joint construction and use of sewer facilities with Southwest Suburban Sewer District; and have acted reasonably and within their powers in making provision for future expansion of said facilities for future development and use within the Local Improvement District No. 62-SS-1 and the remainder of the City of Normandy Park; and did not exceed the city's authority, nor impose unlawful obligations upon the city or upon the property owners within the city and Local Improvement District No. 62-SS-1 by the terms of said contract.

"III. The City of Normandy Park and its council acted within their powers in enacting Ordinance No. 130, establishing Local Improvement District No. 62-SS-1; that they acted reasonably in determining the area of land to be included within said proposed improvement district which can be drained through the trunk sewers and subsewers connected thereto; that they acted reasonably in determin-

ing the area and including all property to be specially bene-
fited by the improvement; and they did not, through the
adoption of Ordinance No. 130, exceed the authority of the
city to levy taxes beyond its authority and limitations con-
tained in RCW 84.52.050 and amendment 17 of the state
constitution.

"IV. The relators and others similarly situated have an
adequate and speedy remedy at law under Chap. 35.44
RCW for hearing any objection which they may have to
charges assessed by the City of Normandy Park against
parcels of land within the district following confirmation of
the final assessment roll for Local Improvement District
No. 62-SS-1.

"V. Judgment shall be entered herein denying relators'
petition for a writ of mandamus or prohibition, and the city
shall have and take its costs and disbursements herein to
be taxed against Verne Frese, Evelyn Frese, Don W. Olson,
Alice Olson, W. H. Martin and Frances Martin."

Appellants assign as error the entering of conclusions of
law Nos. 3 and 4, and the trial court's failure to conclude
(1) that the contract of May 29, 1962, was unlawful in that
it undertook to provide sewage disposal facilities outside
the territory of either party, (2) that the proposed LID
assessments were void, and (3) that ordinance No. 130
violated the 40-mill limit of indebtedness provided by
amendment 17 of the constitution.

Appellants first assign error to the trial court's failure
to conclude as a matter of law that the contract of May
29, 1962, between the City and the Sewer District was in-
valid because it undertakes "to provide sewage disposal
facilities for territory outside the territory of either of the
contracting parties, . . ."

Under the authority granted by RCW 35.24.290, specifi-
cally enumerating the powers of third-class cities, a city
has the power to construct a sewage collection and disposal
system, and, under RCW 35.67.020, every city and town is
authorized to construct, maintain, and operate such system
"within and without its limits." Under RCW 35.67.300, a
city may contract with any other city or organized and
existing sewer district for the

". . . construction and/or operation of any sewer or

sewage disposal facilities for the joint use and benefit of the contracting parties upon such terms and conditions and for such period of time as the governing bodies of the contracting parties may determine. . . ."

As stated by the trial court in its finding of fact, neither the City nor its residents living within the LID will have to pay any increased construction or operation costs by reason of the fact that, under the contract with the Sewer District, the proposed sewer system is to be constructed large enough to provide for future expansion outside the present territory of either party. As far as the City and its residents are concerned, the contract with the Sewer District is made within the above-noted statutory authority and is reasonably appropriate to the needs of the City. Any question sought to be raised by appellants concerning the matter of the cost of the proposed sewer system or the alleged unreasonableness of the assessments on property within the LID has nothing to do with the validity of the contract between the City and the Sewer District. As pointed out later in this opinion, the contention of appellants that the assessments on property within the LID will exceed the special benefits resulting from the proposed improvement, is sought to be raised prematurely and cannot be considered in this case.

Appellants argue that, while the City can enter into the contract, the Sewer District cannot provide for sewer facilities for users outside the City boundaries without first having a contract with the owner of the property to be served, as provided in RCW 35.67.310. Having presently no such contracts, it is argued that the Sewer District has exceeded its statutory authority and the contract with the City should be held invalid.

Since the trial court found that the contract contains no provisions that would obligate appellants, as property owners within the LID, or the City, to pay for the capital cost or maintenance and operation costs of the proposed improvement beyond what they would have been obligated to pay to service their own needs, it seems to us immaterial that the Sewer District intends to service per-

sons living in parts of the Miller Creek Drainage Basin outside the present territorial limits of the Sewer District. Appellants, as residents of the City, have no standing to object to the actions of the Sewer District so long as the City is not obligated to pay any of the costs of providing such service.

We find nothing unlawful in the contract entered into by the City and the Sewer District.

Appellants next complain that the trial court erred in finding that the city council had reasonably determined that the proposed system of sewage disposal within the LID includes, "as nearly as possible," all of the territory which can be drained through trunk sewer and subsewers.

The phrase "as nearly as possible" was first used by the legislature in 1959 in RCW 35.43.040(7), which gives to the city authority to establish a local improvement district for the purpose of constructing sewers and other improvements. Appellants contend that this statute leaves the City no discretion in the determination of the boundaries of the LID, but that the whole of the Miller Creek Drainage Basin (both the portion within and the portion without the city limits) is the area that can be drained by these sewers and subsewers, and therefore *must* be included in the LID.

Appellants cite *Brown v. Anacortes,* 79 Wash. 33, 139 Pac. 652 (1914), to support this interpretation. In *Brown,* the former statute in effect, prior to 1959, contained the phrase "as near as may be" in designating the area to be included in a local improvement district, and was interpreted by this court as leaving to the city authorities discretion in determining the boundaries of a local improvement district. Therefore, appellant concludes that, because there has been this change in statutory language, it must be inferred that the legislature intended to eliminate that discretion allowed in *Brown.*

We do not think the language of the present statute supports such a restrictive interpretation. The trial court found that the city council reasonably determined that the proposed system of trunk sewers within the LID included, as nearly as possible, all territory which can be drained

thereby. To adopt appellants' interpretation of the language used in the statute would compel the city council to include in the LID every parcel of land, whether within or without the city limits, which could *possibly* be drained by the trunk sewer. We do not think the legislature intended to deprive the city council of its discretion to fix the boundaries of the district, and to compel it to substitute for its discretion an inflexible formula to be used without regard to the practical physical considerations of feasibility, expense, and benefits involved in including in the LID distant lands outside the city. We think the record supports the trial court's finding and that the action of the city council was within its statutory authority, and that it reasonably provided sewer facilities for the residents of the LID.

█ Appellants' assignments of error Nos. 3, 5, and 6 relate to the question of whether the total amount of special benefits to be derived by the owners of parcels of land in the local improvement district (allegedly $500,000), as compared to the cost of the improvement (the assessments to be spread on the property allegedly being $900,000), is so small as to render the whole proceeding unconstitutional. This contention is prematurely raised and is not now properly before us. Appellants have a speedy and adequate remedy under RCW chapter 35.44, if they, as property owners, follow its provisions. The city council has yet to confirm its assessment roll, and, if and when it does so, appellants then have the right to challenge its action by appeal to the superior court from the confirmation of the roll. RCW chapter 35.44. *In re Local Imp. Sewer Dist. No. 1,* 84 Wash. 565, 147 Pac. 199 (1915); *Reynolds v. Cosmopolis,* 84 Wash. 660, 147 Pac. 407 (1915); *Pratt v. Seattle,* 111 Wash. 104, 189 Pac. 565 (1920); *In re Local Improvement No. 6097,* 52 Wn. (2d) 330, 324 P. (2d) 1078 (1958); and *In re Schmitz,* 44 Wn. (2d) 429, 268 P. (2d) 436 (1954), and cases cited therein. Until appellants have exhausted their statutory remedies in the premises, they may not be heard to assert in court their claim that the proposed assessment is void on the grounds stated in these three assignments.

Appellants' final assignment of error is directed to the trial court's conclusion of law No. 3 (quoted above) to the effect that the City and its council did not, through the adoption of ordinance No. 130, exceed the authority of the City to levy taxes beyond the limitations contained in RCW 84.52.050 and amendment 17 of the state constitution (generally known as the 40-mill limitation provision). Appellants contend that the trial court erred in entering this conclusion of law.

The argument presented by appellants in support of this assignment is, in substance, that amendment 17 (Art. 7, § 2) prohibits all tax levies exceeding 40 mills without an approval by a vote of the residents of the LID, and that the City is attempting to levy a special assessment in excess of the constitutional limit without the required vote. They say that Art. 7, § 9, of the constitution, which provides for uniform application of local taxes, treats "special assessments" and "special taxation" as being synonymous, and, therefore, the tax limitations of amendment 17 should be interpreted to include the special assessment to be made in the present case.

In *Austin v. Seattle*, 2 Wash. 667, 27 Pac. 557 (1891), this court held that an assessment against the property to be benefited by a local improvement was not limited by the then provisions of Art. 7, §§ 1, 2, or 9 of the constitution.

We there said:

"1. The first proposition, it is claimed by the appellants, must be answered in the negative, because, under the constitution, all taxes and assessments for such special purposes must be levied according to the value of the property taxed. It is true that article 7 of the constitution expressly provides that taxes in the State of Washington shall be according to value, and also that they shall be equal and uniform. It is true, also, that it must be conceded that special taxes or assessments levied for local improvements in cities and towns are so levied under the exercise of a branch of the taxing powers of the state. But, while the question has heretofore been the subject of much controversy in the courts, we think the doctrine is well established at this time that the general use of the term 'taxes' in the constitution does not necessarily include what is meant

by the term 'assessments,' in connection with street and other local improvements, but applies only to the larger exercise of the sovereign power of the state, either directly or through its inferior instrumentalities of county, city, town, school district, etc., in raising general revenues for the support and maintenance of government. . . ."

We think that this distinction between the two types of taxation is applicable here and that amendment 17 was intended to limit only the amount of general ad valorem taxes levied, and has no application to local improvement assessments against the property specially benefited by such improvement. As shown by our decision in *In re Jones,* 52 Wn. (2d) 143, 324 P. (2d) 259 (1958), and cases cited therein, property not benefited by a particular improvement cannot be assessed at all. It is axiomatic that the basic principal and very life of the doctrine of special assessments is that there can be no such assessment on property unless there is a pro tanto special benefit from the improvement. Therefore, since the city is not in this case limited by amendment 17, we find no merit in appellants' last assignment of error.

Finding no error in the trial court's determination of the case, the judgment dismissing appellants' application for a writ of mandamus or prohibition is affirmed. Nothing herein should be construed as prejudicing appellants' right to challenge the final assessment roll after it has been confirmed by the city council by following the appropriate statutory procedure.

The trial court's judgment of dismissal is affirmed.

OTT, C. J., HILL, FINLEY, ROSELLINI, HUNTER, HAMILTON, and HALE, JJ., and MURRAY, J. Pro Tem., concur.