[No. 23954-0-II. Division Two. December 10, 1999.]

NEW CASTLE INVESTMENTS, *Respondent*, v. CITY OF LACENTER, *Appellant*.

*Daniel H. Kearns* of *Reeve Kearns, P.C.*; and *Douglas O. Whitlock* of *Whitlock & Saunders,* for appellant.

*Randall Bryan Printz* of *Landerholm, Memovich, Lansverk & Whitesides, P.S.,* for respondent.

*Jeffrey Scott Myers* of *Law, Lyman, Daniel, Kamerrer & Bogdanovich,* on behalf of Washington Cities Insurance Authority, amicus curiae.

*Stephen Harold G. Overstreet*; and *Mark Stephen Davidson* of *Williams, Kastner & Gibbs, P.L.L.C.,* on behalf of the Building Industry Association of Washington, amicus curiae.

*Roger D. Wynne* and *Bart Joseph Freedman* of *Preston Gates & Ellis,* on behalf of City of Vancouver, amicus curiae.

BRIDGEWATER, C.J. — The City of LaCenter appeals the decision of the Clark County Superior Court, which affirmed the hearings examiner's determination that LaCenter's transportation impact fee ordinance is subject to the vesting statute for land use ordinances, RCW 58.17.033. We hold that the vesting statute does not apply to transportation impact fees (TIFs) because they do not fall within the definition of "land use control ordinances." We therefore hold that LaCenter's impact fee could be applied to New Castle Investments' proposed development even though New Castle's application for preliminary plat approval was perfected prior to the effective date for LaCenter's TIF ordinance. We reverse.

New Castle Investments (NCI) applied to the City of LaCenter for preliminary plat approval on April 7, 1996. Two days later, on April 9, LaCenter adopted its TIF

ordinance, LaCenter Municipal Code (LCMC) 17.07. LaCenter's TIF became effective on April 16.

A hearing on the preliminary plat was held before a city hearings examiner. The hearings examiner issued an order granting approval of the preliminary plat and found that LaCenter's TIF did not apply to the NCI's proposed development because it became effective after the preliminary plat application was perfected.

LaCenter appealed the hearings examiner's decision and a hearing was held before the LaCenter City Council. The Council affirmed the examiner's decision except with respect to his conclusion that the TIF did not apply, which the Council reversed.

NCI then appealed the Council's decision to the Clark County Superior Court. The court reversed the Council's decision and reinstated the hearings examiner's order, finding that the TIF did not apply to the development.

LaCenter appeals the superior court's order and seeks the reinstatement of the Council's order. Three amici curiae briefs have been filed in this case: (1) by the City of Vancouver and the Washington State Association of Municipal Attorneys; (2) by the Building Industry Association; and (3) by the Washington Cities Insurance Authority and the Cities of Battle Ground, Camas, and Washougal. For convenience, references made to the arguments of the City of LaCenter and the two amici briefs from the City of Vancouver, et al., and the Washington Cities Insurance Authority, et al., will be collectively attributed to "the Cities," and references made to the arguments of NCI or the Building Industry Association will be attributed to "the Developers."

The only issue in this case is whether the land use vesting statute, RCW 58.17.033, applies to TIFs assessed on new development. The vesting statute, RCW 58.17.033(1), provides:

A proposed division of land, as defined in RCW 58.17.020, shall be considered under the subdivision or short subdivision

ordinance, and zoning or *other land use control ordinances*, in effect on the land at the time a fully completed application for preliminary plat approval of the subdivision, or short plat approval of the short subdivision, has been submitted to the appropriate county, city, or town official.

(Emphasis added.) The resolution of this case depends upon the meaning of the phrase "land use control ordinances," which is not defined in the statute. Specifically, the issue is whether that term can be used to describe a fee used to pay for city facilities, such as traffic signals or a park, that may be indirectly impacted by new development. The dispute in this case, at its essence, is over the timing of the fee's calculation. The Cities assert the calculation should be made when the building permit is issued; the Developers want it to occur at the time of the application. The Cities assert that TIFs are not land use control ordinances because the Legislature never intended the vesting statute to apply to TIFs and because, as a tax, TIFs do not fall within the definition of land use control ordinance. The Developers contend that TIFs are land use ordinances and are not taxes.

 Statutory construction is a question of law reviewed de novo under the error of law standard. *See Waste Management of Seattle, Inc. v. Utilities & Transp. Comm'n*, 123 Wn.2d 621, 627, 869 P.2d 1034 (1994) (citing *City of Pasco v. Public Employment Relations Comm'n*, 119 Wn.2d 504, 507, 833 P.2d 381 (1992); *Inland Empire Distribution Sys., Inc. v. Utilities & Transp. Comm'n*, 112 Wn.2d 278, 282, 770 P.2d 624, 87 A.L.R.4TH 627 (1989)). A court will afford deference to an agency's construction of a statute only if the statute is ambiguous and the agency is charged with the administration and enforcement of the statute at issue. *Waste Management*, 123 Wn.2d at 628. Only then will agency interpretation be given "great weight" in determining legislative intent. *Id.* (citing *Pasco*, 119 Wn.2d at 507) (citing *Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 813-14, 828 P.2d 549 (1992)). The authority to interpret statutes ultimately lies with the courts. *Waste*

*Management*, 123 Wn.2d at 627 (citing *Franklin County Sheriff's Office v. Sellers*, 97 Wn.2d 317, 325-26, 646 P.2d 113 (1982)).

■ ■ "In construing statutes, the primary objective is to ascertain the intent of the Legislature." *Cowiche*, 118 Wn.2d at 813. Clear language will be given effect. *People's Org. for Wash. Energy Resources v. Utilities & Transp. Comm'n*, 104 Wn.2d 798, 825, 711 P.2d 319 (1985). If a term is defined in a statute, that definition is used. *Cowiche*, 118 Wn.2d at 813. Absent a statutory definition, the term is generally accorded its plain and ordinary meaning unless a contrary legislative intent appears. *Dennis v. Department of Labor & Indus.*, 109 Wn.2d 467, 479-80, 745 P.2d 1295 (1987).

## I. Statutory Language

The Developers claim that this case can be resolved simply by a plain reading of the statute. But the statute does not define "other land use control ordinances." The Developers assert that a TIF is a land use *control* ordinance because it is a land use ordinance. TIFs were authorized by the Growth Management Act (GMA), which regulates land use, and TIFs apply only to land use projects. But the Cities argue that a TIF does not "control" development, in the sense that it limits or changes the development in any way. The Cities' argument comports with the dictionary definition of control, which is the "[p]ower or authority to manage, direct, superintend, restrict, regulate, govern, administer, or oversee. The ability to exercise a restraining or directing influence over something." Black's Law Dictionary 329 (6th ed. 1990). TIFs do not exercise a restraining or directing influence over land use; they increase only the cost. Therefore, if we look only at the individual meaning of the word control, TIFs do not "control" land use. But the dictionary definition of one word does not decide this case, for our primary goal is to ascertain the Legislature's intended meaning of the term. Therefore, we will look at

the Legislature's expressions of its intent, as well as past interpretations of the vesting statute, to decide whether the vesting statute was intended to apply to TIFs.

## II. LEGISLATIVE INTENT

The Cities contend that applying the vesting statute to TIFs would be contrary to legislative intent. The Cities believe that the Legislature did not intend that TIFs would be calculated until the building permit is issued.

The Legislature addressed the time for vesting of TIFs in the original version of the creating legislation.

> (5) Notwithstanding any other provision of sections 43 through 48 of this act, that portion of a project for which a valid building permit has been issued prior to the effective date of a county, city, or town impact fee ordinance, adopted pursuant to sections 43 through 48 of this act, shall not be subject to impact fees under such ordinance so long as the building permit remains valid and construction is commenced and is pursued according to the terms of the permit.

LAWS OF 1990, 1st Ex. Sess., ch. 17, § 45. (Clerk's Papers (CP) 128.) Thus, the Legislature expressly stated that the impact fees vested upon the issuance of a building permit (rather than upon filing the application). Unfortunately for our purposes, this section was vetoed by the Governor for reasons unrelated to the time for vesting.[1] Nevertheless, the Cities argue that the presence of this provision within the original legislation shows that the Legislature did not intend TIFs to vest at the time of application.

■ The Developers contend that section five cannot be considered legislative intent because it was vetoed. The general rule is: "In exercising the veto power, the governor acts as a part of the legislative bodies and the act is to be considered now just as it would have been if the vetoed

---

[1]The Governor objected to subsection one, which he felt would limit "substantive authority under the State Environmental Policy Act." LAWS OF 1990, 1st Ex. Sess, ch. 17, § 45, comments following act.

provisions had never been written into the bill at any stage of the proceedings." *Shelton Hotel Co. v. Bates*, 4 Wn.2d 498, 506, 104 P.2d 478 (1940). But in this case, the Governor's veto statement made clear that it was not section five that he objected to, but another section. The Governor's veto statement is a part of legislative intent. *Department of Ecology v. Theodoratus*, 135 Wn.2d 582, 594, 957 P.2d 1241 (1998). Therefore, section five is a reflection of legislative intent and it does indicate that the Legislature intended that TIFs vest at the time the permit is issued, rather than at the time of application.

### III. COMMON LAW VESTED RIGHTS DOCTRINE

At common law, "[t]he purpose of the vested rights doctrine [was] to provide a measure of certainty to developers and to protect their expectations against fluctuating land use policy." *Noble Manor Co. v. Pierce County*, 133 Wn.2d 269, 278, 943 P.2d 1378 (1997). The common law purpose is consistent with the Legislature's expressed purpose for the vesting statute. The Final Legislative Report on the bill enacting RCW 58.17.033 stated, in part, that the statute was intended to prevent a project from being " 'obstructed by enacting new zoning ordinances or building codes.' " *Noble Manor*, 133 Wn.2d at 277 (quoting FINAL LEGISLATIVE REPORT, 50th Legis., Reg. Sess. 255 (1987)).

But although the vested rights doctrine was to protect developers, there are "important competing policy concerns regarding vested rights for land use":

> [D]evelopment interests protected by the vested rights doctrine come at a cost to the public interest because the practical effect of recognizing a vested right is to sanction the creation of a new nonconforming use. If a vested right is too easily granted, the public interest is subverted. However, we also recognize developers' needs for certainty and fairness in planning their developments. . . . [T]he Legislature has made the policy decision that developers should be able to develop their property according to the laws in effect at the time they make completed application for subdivision or short subdivision of their property.

*Noble Manor,* 133 Wn.2d at 280 (citations omitted). With these concerns in mind, it is important that the vested rights doctrine not be applied more broadly than its intended scope. The cost of a development, which is the only aspect of development affected by TIFs, is a large part of the developer's decision making. Certainly it is to the developer's advantage if the cost can be determined early in the process and with some degree of certainty. But it does not necessarily follow that the cost of development is the type of expectation the vested rights doctrine was intended to protect.

The right that vests, according to *Noble Manor,* is "the right to have the uses disclosed in [the applicant's] application considered by the county or local government under the laws in existence at the time of the application." 133 Wn.2d at 283. According to legal commentators, "[t]he vested rights rule is generally limited to those laws which can loosely be considered 'zoning' laws." WASH. STATE BAR ASS'N, WASHINGTON REAL PROPERTY DESK BOOK, § 97.8(2)(d) (3d ed. 1996). A TIF does not limit the use of land, nor does it resemble a zoning law. Instead, a TIF merely affects the ultimate cost of the development. Thus, it is not the type of right that vests under the vested rights doctrine.

At its core, a TIF is a fee charged to new development. The Court of Appeals has held in a somewhat different context that "it is inappropriate to apply the vesting doctrine to fees." *Lincoln Shiloh Assocs. v. Mukilteo Water Dist.,* 45 Wn. App. 123, 128, 724 P.2d 1083, 742 P.2d 177, *review denied,* 107 Wn.2d 1014 (1986). *Lincoln* held that there is no vested right to lower fees charged for connecting to a water system:

> Lincoln is not being forced to use its land or build differently from that which Lincoln was able to do at the time its plans were approved by the District. Instead, the cost is increased. Lincoln had no more than an expectation that the connecting charges would remain at $6,400. There is no vested right here to the connection fee remaining $6,400.

45 Wn. App. at 128-29. Although the fees addressed in

*Lincoln* are in a different category than TIFs, the reasoning in that case is equally applicable here.

Therefore, it would be inconsistent with the purpose behind the vested rights doctrine and the vesting statute to apply it to fees such as TIFs.

## IV. REGULATION OR TAX?

■ The Cities also argue that the definition of "land use control ordinance" does not reasonably include taxes, and that TIFs are taxes. The Developers dispute that TIFs are taxes, arguing instead that they are regulatory fees. Whether a charge imposed by a governmental entity is a tax or a regulatory fee depends upon three factors: (1) whether the primary purpose is to raise revenue (tax) or to regulate (regulatory fee); (2) "whether the money collected must be allocated only to the authorized regulatory purpose;" and (3) "whether there is a direct relationship between the fee charged and the service received by those who pay the fee or between the fee charged and the burden produced by the fee payer." *Covell v. City of Seattle*, 127 Wn.2d 874, 879, 905 P.2d 324 (1995).

In *Hillis Homes, Inc. v. Snohomish County*, 97 Wn.2d 804, 805, 650 P.2d 193 (1982), the court determined that county ordinances that impose fees on new residential subdivisions and housing proposals to fund public infrastructure are taxes rather than regulatory fees. Although this case was decided before the adoption of the GMA and before the TIF legislation, the fees it evaluates are nearly identical to TIFs and the case is therefore analogous. Like TIFs, the fees in *Hillis Homes* were imposed on new subdivisions in order to mitigate the impact of new development on parks, solid waste disposal facilities, roads, and law enforcement. *Id.* at 806. Also, like TIFs, there were restrictions on the use and handling of the fees: the fees were to be deposited in special accounts, and use of the fees was to be restricted to capital improvements that would benefit the geographical area from which the payment was made. *Id.* The court held that the purpose of imposing these fees was to raise revenue:

The terms of both ordinances clearly provide that the fees are to be applied to offset the costs of providing specified services. Neither ordinance makes any provision for regulation of residential developments. Therefore, it appears that the primary purpose, if not the only purpose of both ordinances, is to raise revenue rather than to regulate residential developments. For this reason, we hold that the ordinances impose a tax.

*Hillis Homes*, 97 Wn.2d at 810.

Like the fees in *Hillis Homes*, here with TIFs, there can be no question but that the purpose of TIFs is to finance public facilities and system improvements, in·other words, to raise revenue. *See* RCW 82.02.050; RCW 82.02.090(3). Although these fees may have some land-use related objectives, such as ensuring orderly growth (RCW 82.02-.050(1)(b); LCMC 17.07.020(B)), these fees are not "merely tools in the regulation of land subdivision." *Hillis Homes*, 97 Wn.2d at 809. The primary purpose of the fees is to raise money. Under *Hillis Homes*, the determination that the purpose is fiscal is sufficient to support the determination that the fees are taxes. *Id.*

TIFs also resemble taxes according to the other two *Covell* factors. TIFs serve a public purpose or to "pay for public facilities." RCW 82.02.090(3); RCW 82.02.050(1)(a). And there is no *direct* relationship between the fees charged and the particular development. Although impact fees must be "reasonably related" to the impact of new development on the public infrastructure, they are not individually calculated for each new development, but rather are based on a general calculation that applies to all new development. RCW 82.02.090(3); RCW 82.02.050(3) and (4); RCW 82.02.060. The developers argue that the "heightened scrutiny" mandated by *Dolan v. City of Tigard*, 512 U.S. 374, 114 S. Ct. 2309, 129 L. Ed. 2d 304 (1994), and *Nollan v. California Coastal Comm'n*, 483 U.S. 825, 107 S. Ct. 3141, 97 L. Ed. 2d 677 (1987), would apply to impact fees and would require a direct relationship between the fees

and the burden produced or benefit received by the payor. But even if the standard articulated in *Dolan* and *Nollan* applies, the fee need be only roughly proportional to the projected impact of new development. *Dolan*, 512 U.S. at 391. This is not a *direct* relationship. Therefore, consideration of the three *Covell* factors leads to the conclusion that TIFs are taxes rather than regulatory fees.

But the Developers contend that TIFs are not taxes because, unlike taxes, there are restrictions placed on the handling and use of the money.[2] This argument is not persuasive. Similar restrictions were placed on the fees considered in *Hillis Homes*, yet the court still found them to be taxes. Also, the statute authorizing TIFs requires a nexus between the fee charged and the use made of the money, which the Developers argue is not the character of a tax. However, as the Cities point out, an even greater nexus requirement is placed on special assessment taxes,[3] where the assessed property must be specially benefited by the improvements, as distinguished from a general benefit to the entire district. *See Bellevue Plaza, Inc. v. City of Bellevue*, 121 Wn.2d 397, 404, 851 P.2d 662 (1993). Thus, the nature of TIFs is not inherently inconsistent with their characterization as taxes.

But their resemblance to taxes is inconsistent with placing TIFs within the definition of "land use control ordinance." The placement of TIFs among tax statutes, rather than land use regulations, indicates that they are in a different category from other land use statutes. RCW 82.02.050 through RCW 82.02.090 (the GMA impact fee statute) was adopted as part of the GMA in 1990. But it was not placed in the RCW chapters governing land use control or development regulation; instead, it was codified

---

[2]TIF fees must be retained in a special account (RCW 82.02.070); the interest must be spent only on system improvements (RCW 82.02.070); the funds must be spent in conformance with the municipality's growth management plan (RCW 82.02.070); and the funds must be spent within five years of collection or be returned to the payor (RCW 82.02.080).

[3]Special assessments are a type of tax. *State ex rel. Frese v. City of Normandy Park*, 64 Wn.2d 411, 423, 392 P.2d 207 (1964).

among excise taxes in RCW 82. RCW 82.02.050(3)(a) directs that the fees "[s]hall only be imposed for system improvements that are reasonably related to the new development." And RCW 82.02.090(9) defines "system improvements" as follows: " 'System improvements' mean public facilities that are included in the capital facilities plan and are designed to provide service to service areas within the community at large, in contrast to project improvements." For example, new development may result in additional road traffic that necessitates additional traffic signals, or it may result in additional use of city parks, and TIFs may be used by the cities to improve these public facilities to meet the predicted additional demand. By the clear language of the statute, GMA impact fees are not intended to compensate local governments for the direct impacts of specific development projects on specific components of local infrastructure systems or to finance programs that regulate development. Local governments have the authority to impose exaction and dedication requirements to mitigate for direct project impacts under SEPA, the Local Transportation Act, and RCW 82.02.020.

We do not hold that these fees are taxes, but only that these fees do not fall within the vesting statute as "land use control ordinances." By their nature, TIFs are fees that augment tax dollars; they are another source of revenue for improvements that benefit the public in general, and they are not intended to regulate the particular development. Thus, we are satisfied through our analysis of the *Covell* factors and *Hillis Homes* that TIFs have characteristics that distinguish them from regulations. The statutory character of TIFs indicates that the impact fee is in a different category from other land use statutes and does not fall within the definition of "land use control ordinance."

## V. PUBLIC POLICY

Finally, to apply the vesting statute to TIFs would thwart the Legislature's intent that TIFs be "reasonably related

to the new development that creates additional demand and need for public facilities, that is a proportionate share of the cost of the public facilities, and that is used for facilities that reasonably benefit the new development." RCW 82.02.090(3). These are perhaps the reasons the Legislature required TIFs to be tied to the local growth management plan, which evolves over time. RCW 82.02.050(4). The time lag between the application for preliminary plat approval and the issuance of the permit application may be many years.[4] Thus, the fee calculated by LaCenter at the time of preliminary plat approval would bear little relationship to the actual impact of growth at the time the permit is issued.

The TIFs do not affect the physical aspects of development (i.e., building height, setbacks, or sidewalk widths) or the type of uses allowed (i.e., residential, commercial, or industrial). If they did, then TIFs would be subject to the vested rights doctrine. In other words, "[the developer] is not being forced to use its land or build differently from that which [the developer] was able to do at the time its plans were approved . . . . Instead, the cost is increased." *Lincoln Shiloh Assocs.*, 45 Wn. App. at 128. To freeze the calculation of the impact fee at the time of application would disconnect planning and financing from the actual effects of growth. The Legislature has stated that the indirect effects of growth can be recovered. If the fee were frozen, then new growth could take place without the developer paying its fair share for improving public facilities. The developer could be paying an impact fee that reflects a planning effort and a cost that is no longer relevant. The TIFs must be calculated when the growth is to occur, at the time of the building permits; otherwise cities would be underfunded to pay for the indirect costs of new growth.

■ Because TIFs do not "control" land use, do not affect the developer's rights with regard to the physical use

---

[4]The amicus curiae for the Cities asserts it may be 12 years or longer.

of his or her land, and are best characterized as revenue raising devices rather than land use regulation, we hold that the definition of "land use control ordinances" does not include TIFs. This holding is consistent with legislative intent and public policy behind the TIF and the vesting statute. The vesting statute does not apply to TIFs.

Reversed.

SEINFELD and HUNT, JJ., concur.

Review denied at 140 Wn.2d 1019 (2000).