[No. 29018-9-II. Division Two. January 22, 2004.]

THE CITY OF OLYMPIA, *Respondent*, v. JOHN DREBICK, ET AL.,
*Appellants*.

*Alexander W. Mackie* and *Greg Overstreet* (of *Perkins Coie, L.L.P.*), for appellants.

*Bob C. Sterbank, City Attorney,* and *John E. Vanek, Assistant; Jeffrey S. Myers* (of *Law, Lyman, Daniel, Kammerer & Bogdanovich*); and *David J. Lenci* and *Julie A. Halter* (of *Preston Gates & Ellis, L.L.P.*), for respondent.

*Russell C. Brooks* and *Robin L. Rivett* on behalf of Pacific Legal Foundation, amicus curiae.

*Kristopher I. Tefft* on behalf of Building Industry Association of Washington, amicus curiae.

MORGAN, J. — John Drebick wanted to build an office building in the city of Olympia (City). Citing the Growth Management Act (GMA),[1] chapter 36.70A RCW, the City conditioned the building permit for a new office building on his payment of a traffic impact fee. Acting pursuant to Title 15 of its Municipal Code, the City calculated the fee by averaging the cumulative traffic-related impacts of all new office buildings. We assume that when the City made its calculation, it did not determine the individualized traffic-related impacts of the specific building.[2] A hearing examiner held that the fee could not exceed the individualized impacts of the specific building, but the superior court held to the contrary. Agreeing with the hearing examiner, we reverse the superior court and remand for further proceedings.

In 1998, John Drebick sought a building permit from the city of Olympia. He wanted to build a new commercial office building near the City's boundary, just off Highway 101.

---

[1] LAWS OF 1990, 1st Ex. Sess., ch. 17.

[2] The parties agree that the City did not determine individualized impacts quasi-judicially, and we assume that the City could not or did not determine such impacts legislatively.

The building was to have four stories and 54,698 square feet. The City granted the permit on the condition that Drebick help to improve the City's roads by paying a traffic impact fee.

The City calculated the fee by estimating (1) the total square footage of all new commercial office space likely to be built within the city's boundaries and (2) the cost of all road improvement projects that such space would necessitate within the city's boundaries. It then divided (1) into (2) to obtain an average rate per square foot that each new office building should pay toward all of the City's road improvement projects, regardless of any particular building's traffic-related impacts. Multiplying this average rate ($2.95 per square foot) times the number of square feet in Drebick's specific development (54,698) resulted in a fee of $161,359,[3] which Drebick paid under protest.[4]

Drebick appealed to the City's hearing examiner. Citing RCW 82.02.050(3), he argued in part that the City could not impose an impact fee that exceeded the individualized traffic-related effects of his specific project and that those effects would be fully mitigated by a payment of about $29,000. The City countered that it was imposing an excise tax, not a regulatory fee, and thus that it could impose such a tax without regard to the individualized impacts of Drebick's specific project.

The hearing examiner agreed with Drebick. Accordingly, he "reversed on the issue of whether the . . . impact fees comply with the . . . requirements of RCW 82.02.050(3)."[5] He also remanded to the City for "adjustments . . . consistent with this decision."[6]

The City appealed to the Thurston County Superior Court, which reversed the hearing examiner. The superior

---

[3] Drebick paid $132,328 in cash and the remainder through certain credits not at issue here.

[4] *See* RCW 82.02.070(4).

[5] 2 Clerk's Papers (CP) at 48, 318.

[6] 2 CP at 48, 318.

court held that the City's assessment was "analogous to" a tax and thus that the City did not have to show a "proportional nexus" between its assessment and the traffic-related effects of Drebick's specific project.[7] Drebick tried to appeal directly to the Supreme Court, but that court transferred the case here.

In this court, Drebick contends that state law, and specifically RCW 82.02.050(3), prohibits the City from imposing a traffic impact fee without considering the traffic-related effects of his specific project. The City responds that it was imposing a tax, not a fee, and thus that state law did not require it to consider the effects of Drebick's particular development.

Preliminarily, we emphasize the limits of this opinion. As just noted, the City contends that state law does not require it to consider the individualized impacts of Drebick's specific project. Drebick contends to the contrary. Neither party contends that *if* state law requires the City to determine the individualized impacts of a specific project, the City did that by enacting an ordinance with categories narrow enough to *constitute* an assessment of individualized impacts. Accordingly, this opinion is limited to the question whether RCW 82.02.050(3) requires the City to consider and determine the individualized impacts of Drebick's specific project. We leave for another day the question whether a city can perform the necessary assessment *legislatively*, by enacting an ordinance with narrow enough categories, or whether a city must perform the necessary assessment *quasi-judicially*, through a hearing examiner or similar official. In short, we analyze the meaning of state law, but not whether the City's ordinance complies with state law.

█ Beginning our analysis, we have no quarrel with the City's claim that it was imposing a tax rather than a fee.[8] For purposes of this case, however, the distinction is imma-

---

[7] 4 CP at 673-74.

[8] *See New Castle Invs. v. City of LaCenter*, 98 Wn. App. 224, 235-36, 989 P.2d 569 (1999) (although impact fees "resembl[e]" taxes, "[w]e do not hold that [they] are taxes"), *review denied*, 140 Wn.2d 1019 (2000).

terial. RCW 82.02.020 was amended as part of the GMA.[9] It states:

> Except as provided in RCW 82.02.050 through 82.02.090, no county, city, town, or other municipal corporation shall impose *any tax, fee, or charge*, either direct or indirect, on the construction or reconstruction of residential buildings, commercial buildings, industrial buildings, or on any other building or building space or appurtenance thereto, or on the development, subdivision, classification, or reclassification of land.[10]

Given that RCW 82.02.020 bars *either* a tax *or* a fee "[e]xcept as provided in RCW 82.02.050 through 82.02.090," the question here is not whether the City assessed a tax or fee, but whether the City complied with RCW 82.02.050 through RCW 82.02.090.

RCW 82.02.050(2) authorizes impact fees. Enacted as part of the 1990 GMA,[11] it states:

> (2) Counties, cities, and towns that are required or choose to plan under RCW 36.70A.040 are authorized to impose impact fees[12] on development activity[13] as part of the financing for public facilities,[14] provided that the financing for system improvements[15] to serve new development must provide for a

---

[9] Laws of 1990, 1st Ex. Sess., ch. 17, § 42.

[10] (Emphasis added.)

[11] Laws of 1990, 1st Ex. Sess., ch. 17, § 43(2).

[12] RCW 82.02.090(3) defines "impact fee" as "a payment of money imposed upon development as a condition of development approval to pay for public facilities needed to serve new growth and development, and that is reasonably related to the new development that creates additional demand and need for public facilities, that is a proportionate share of the cost of the public facilities, and that is used for facilities that reasonably benefit the new development."

[13] RCW 82.02.090(1) defines "development activity" as "any construction or expansion of a building, structure, or use, any change in use of a building or structure, or any changes in the use of land, that creates additional demand and need for public facilities."

[14] RCW 82.02.090(7) defines "public facilities" as "(a) [p]ublic streets and roads; (b) publicly owned parks, open space, and recreation facilities; (c) school facilities; and (d) fire protection facilities in jurisdictions that are not part of a fire district."

[15] RCW 82.02.090(9) defines "system improvements" as "public facilities that are included in the capital facilities plan and are designed to provide service to

balance between impact fees and other sources of public funds and cannot rely solely on impact fees.

RCW 82.02.050(3) caps impact fees. Enacted at the same time as RCW 82.02.050(2),[16] it states that impact fees:

(a) Shall only be imposed for system improvements that are reasonably related to the new development;

(b) Shall not exceed a proportionate share[17] of the costs of system improvements that are reasonably related to the new development; and

(c) Shall be used for system improvements that will reasonably benefit the new development.

RCW 82.02.050(3)'s cap is ambiguous in at least two ways. First, do the words "the new development" refer to all developments that are new, or only to the permittee's specific development that is new? Second, do the words "reasonably related to" connote a relationship between the system improvements for which fees are imposed and the cumulative impacts of all new development activity, or between the system improvements for which fees are imposed and the individualized impacts of the permittee's specific project? When the cap states that impact fees "[s]hall only be imposed for system improvements that are reasonably related to the new development[,]" it might mean that impact fees must be "reasonably related to" the cumulative impacts of *all* new development, or it might mean that impact fees must be "reasonably related to" the individualized effects of the specific new development for which a permit is being issued.

---

service areas within the community at large, in contrast to project improvements." RCW 82.02.090(6) defines "project improvements" in part as "site improvements and facilities that are planned and designed to provide service for a particular development project and that are necessary for the use and convenience of the occupants or users of the project, and are not system improvements."

[16] Laws of 1990, 1st Ex. Sess., ch. 17, § 43(3).

[17] RCW 82.02.090(5) defines "proportionate share" as "that portion of the cost of public facility improvements that are reasonably related to the service demands and needs of new development."

■ When a statute is ambiguous, our task is to ascertain and effectuate legislative intent.[18] To perform that task, we may use both legislative history[19] and the rules of statutory construction.[20] We turn first to legislative history.

House Bill (HB) 2929 was the GMA's precursor. As introduced on January 26, 1990, HB 2929 would have authorized a city to impose impact fees for public improvements related *either* to the individual impacts of a specific project *or* to the cumulative impacts of all similar projects.[21] As introduced, HB 2929 lacked a cap or limitation like that later incorporated into RCW 82.02.050(3). It stated in part:

> Impact fees may be required to mitigate potential impacts on public facilities and public services . . . arising from development activity that is authorized by the issuance of a permit . . . . *Such impacts could arise from the development activity itself, or the cumulative impact arising from development activity.*[22]

By the time HB 2929 passed the House, it had been amended in committee.[23] But it still did not contain a cap or limitation, and it still would have authorized a city to impose impact fees for public improvements related either to the individual impacts of a specific project or to the cumulative impacts of all similar projects.[24] It stated in part:

---

[18] *Morgan v. Johnson*, 137 Wn.2d 887, 892, 976 P.2d 619 (1999); *Whatcom County v. City of Bellingham*, 128 Wn.2d 537, 546, 909 P.2d 1303 (1996).

[19] *Dep't of Ecology v. Campbell & Gwinn, L.L.C.*, 146 Wn.2d 1, 11-12, 43 P.3d 4 (2002); *In re F.D. Processing, Inc.*, 119 Wn.2d 452, 460, 832 P.2d 1303 (1992).

[20] *Vance v. Dep't of Ret. Sys.*, 114 Wn. App. 572, 577, 59 P.3d 130 (2002), *review denied*, 149 Wn.2d 1028 (2003); *Parkridge Assocs. v. Ledcor Indus., Inc.*, 113 Wn. App. 592, 602, 54 P.3d 225 (2002).

[21] H.B. 2929, as introduced, 51st Leg., Reg. Sess., § 36(1) (Wash. 1990); HOUSE JOURNAL, 51st Leg., Reg. Sess., at 172-73 (Wash. 1990).

[22] H.B. 2929, as introduced, 51st Leg., Reg. Sess., § 32 (Wash. 1990) (emphasis added).

[23] HOUSE JOURNAL, 51st Leg., Reg. Sess., at 676, 680-81, 684 (Wash. 1990).

[24] ENGROSSED SUBSTITUTE H.B. 2929, 51st Leg., Reg. Sess., § 30(1) (Wash. 1990).

Counties, cities, and towns are authorized to impose impact fees, excise taxes on development activity, or excise taxes on the privilege of engaging in business that constitutes development, to mitigate reasonably related needs for housing relocation impacts and potential impacts on any public facilities . . . arising from development activity that is authorized by the issuance of a permit, or other approval, by the county, city, or town. *Such impacts could arise directly or indirectly from the development activity itself or the cumulative impact arising from development activity.*[25]

When HB 2929 reached the Senate, the sponsors of a "striking amendment" proposed to delete the House's language[26] and authorize "the Puget Sound regional growth authority"—but not counties, cities, or towns—to impose impact fees capped at "one percent *of a specific project's* fair market value."[27] During debate on the Senate floor, the sponsor of an amendment to the striking amendment proposed to restore the House's language allowing counties, cities, and towns to base impact fees on *either* the individual impacts of a specific development *or* the cumulative impacts of all new development.[28] The amendment to the striking amendment would have stated:

The legislature intends to assure that taxpayers are no longer unfairly assessed the costs of development of an area by permitting a fair and equitable portion to be assessed through impact fees. It intends to provide for a better base of funding and for mitigating specifically attributable costs of growth and growth development to the infrastructure of cities, towns, and counties, including but not limited to roads, schools, bridges, parks, and recreational facilities. *Such impacts may arise*

---

[25] ENGROSSED SUBSTITUTE H.B. 2929, 51st Leg., Reg. Sess., § 30 (Wash. 1990) (emphasis added).

[26] S. AMENDED ENGROSSED SUBSTITUTE H.B. 2929, 51st Leg., Reg. Sess. (Wash. 1990); SENATE JOURNAL, 51st Leg., Reg. Sess., at 938 (Wash. 1990).

[27] SENATE JOURNAL, 51st Leg., Reg. Sess., at 1212-13 (Wash. 1990) (emphasis added).

[28] SENATE JOURNAL, 51st Leg., Reg. Sess., at 1233-35 (Wash. 1990).

*directly or indirectly from the development activity itself or from*
*the cumulative impact arising from development activity.*[29]

After rejecting this amendment to the striking amendment,[30] the Senate approved the striking amendment itself.[31]

The House refused to concur in the Senate's striking amendment.[32] The two houses then batted the bill back and forth,[33] until finally a free conference committee was appointed.[34] The free conference committee crafted entirely new language, obviously as a compromise, by which it proposed to limit impact fees to those "imposed for system improvements that are reasonably related to *the* new development."[35] The new language was reported to both houses on April 1, 1990, and enacted by both houses that same day.[36] It was approved by the governor on April 9, 1990,[37] and codified as RCW 82.02.050(3).

Based on this legislative history, we make three observations. First, we observe that the 1990 legislature, with apparent intentionality, omitted any authorization to impose impact fees for system improvements related to the cumulative impacts of all new development. The House passed a provision authorizing impact fees to mitigate *either* the individualized impacts of a particular new devel-

---

[29] SENATE JOURNAL, 51st Leg., Reg. Sess., at 1233 (Wash. 1990) (emphasis added).

[30] SENATE JOURNAL, 51st Leg., Reg. Sess., at 1235 (Wash. 1990).

[31] SENATE JOURNAL, 51st Leg., Reg. Sess., at 1235 (Wash. 1990).

[32] HOUSE JOURNAL, 51st Leg., Reg. Sess., at 1293 (Wash. 1990); SENATE JOURNAL, 51st Leg., Reg. Sess., at 1336 (Wash. 1990).

[33] *See* HOUSE JOURNAL, 51st Leg., Reg. Sess., at 1274, 1380 (Wash. 1990); SENATE JOURNAL, 51st Leg., Reg. Sess., at 1336, 1907 (Wash. 1990).

[34] HOUSE JOURNAL, 51st Leg., Reg. Sess., at 1766 (Wash. 1990); SENATE JOURNAL, 51st Leg., Reg. Sess., at 1336 (Wash. 1990).

[35] HOUSE JOURNAL, 51st Leg., Reg. Sess., at 1867 (Wash. 1990) (emphasis added); SENATE JOURNAL, 51st Leg., Reg. Sess., at 1919 (Wash. 1990) (emphasis added).

[36] HOUSE JOURNAL, 51st Leg., Reg. Sess., at 1962 (Wash. 1990); SENATE JOURNAL, 51st Leg., Reg. Sess., at 1942 (Wash. 1990).

[37] ENGROSSED SUBSTITUTE H.B. 2929, as enacted, 51st Leg., Reg. Sess., at 82 (Wash. 1990).

opment *or* the cumulative impacts of all new development. Rejecting the House's provision, the Senate passed one that limited impact fees to "one percent *of a specific project's* fair market value."[38] The free conference committee proposed entirely new language—obviously a compromise—that both houses quickly adopted. The free conference committee had the House provision before it, yet chose to omit any reference to "cumulative impacts." As a consequence, it appears to us that when the 1990 legislature adopted its free conference committee's new language—i.e., when the 1990 legislature said that impact fees "shall only be imposed for system improvements reasonably related to the new development"—it was intending to authorize impact fees "reasonably related" to the individualized impacts of a permittee's specific new development, as opposed to impact fees "reasonably related to" the cumulative impacts of all new development.

Second, we observe that the 1990 legislature, following the recommendation of its free conference committee, chose to preface the words "new development" with the definite article "the." We can readily understand why the legislature would have done that if it were intending to authorize impact fees reasonably related to the particular development of each permittee; but we cannot understand why the legislature would have done that if it were intending, as the House had earlier intended, to authorize impact fees reasonably related to the cumulative impacts of all new development.

Third, we observe that the 1990 legislature, again following the recommendation of its free conference committee, used a phrase, "reasonably related to," that it apparently borrowed from *Nollan v. California Coastal Commission*.[39] Decided in 1987 by the United States Supreme Court, *Nollan* was a case in which the Nollans applied for a permit to build a house on beachfront property. The Coastal

---

[38] SENATE JOURNAL, 51st Leg., Reg. Sess., at 1212-13 (Wash. 1990) (emphasis added).

[39] 483 U.S. 825, 107 S. Ct. 3141, 97 L. Ed. 2d 677 (1987).

Commission granted the permit—but only on condition that the Nollans donate an easement across their beachfront for use as a public trail. The Court held that the Commission's condition was an unconstitutional taking of private property without just compensation because the exacted property (the easement) was for a public improvement (the trail) that was not "reasonably related to" the impacts of the specific project (the Nollans' new house). The Court stated:

> The Commission claims . . . that we may sustain the condition at issue here by finding that it is *reasonably related to* the public need or burden that *the Nollans' new house* creates or to which it contributes. We can accept, for purposes of discussion, the Commission's proposed test as to how close a "fit" between the condition and the burden is required, because we find that this case does not meet even the most untailored standards.[40]

Clearly then, the Court used the phrase "reasonably related to" to require a connection or "nexus" between the public problem the Commission wanted to alleviate (the public's lack of access along the beach) and the individualized impacts of the Nollans' *specific* project.

When the 1990 legislature was considering the GMA, it undoubtedly knew about *Nollan*, which was then the *only* case in which the United States Supreme Court had addressed the propriety of conditioning a building permit on the exaction of private property without compensation. Thus, we infer that the 1990 legislature did not use *Nollan*'s phrase ("reasonably related to") by coincidence; instead, we think, the legislature used the same phrase with intent to adopt *Nollan*'s meaning and assure the new statute's constitutionality. *Nollan* had used the phrase ("reasonably related to") to mean a link or "nexus" between the public problem to be alleviated and the individualized impacts of the permittee's *specific* project, and we conclude that the 1990 legislature used the same phrase in the same way.

---

[40] 483 U.S. at 838 (emphasis added).

 Leaving legislative history, we make two additional observations using the rules of statutory construction. First, a municipality's taxing authority must be express.[41] Such authority must be denied when in doubt,[42] and construed in the taxpayer's favor when ambiguous.[43] These rules apply not only when deciding whether taxing authority exists in the first place, but also when deciding its limits.[44] As already seen, the cap set by RCW 82.02.050(3) is ambiguous; it might limit impact fees to those reasonably related to the cumulative impacts of all new development, or it might limit such fees to those reasonably related to the individualized impacts of a specific project. Even if RCW 82.02.050(2) authorizes a tax rather than a fee, as the City contends, RCW 82.02.050(3) must be construed in Drebick's favor.

 Second, every statute should be construed as constitutional if such a construction is reasonably possible.[45] *Nollan v. California Coastal Commission*,[46] the United States Supreme Court case we described above, and *Dolan v. City of Tigard*,[47] a United States Supreme Court case from 1994, are the leading authorities on when it is constitutional to exact property by conditioning a permit. In

---

[41] *Okeson v. City of Seattle*, 150 Wn.2d 540, 556, 78 P.3d 1279 (2003); *Hillis Homes, Inc. v. Snohomish County*, 97 Wn.2d 804, 809, 650 P.2d 193 (1982).

[42] *Okeson*, 150 Wn.2d at 558; *Ivy Club Investors Ltd. P'ship v. City of Kennewick*, 40 Wn. App. 524, 528, 699 P.2d 782, *review denied*, 104 Wn.2d 1006 (1985).

[43] *Gould v. Gould*, 245 U.S. 151, 153, 38 S. Ct. 53, 62 L. Ed. 211 (1917); *Simpson Inv. Co. v. Dep't of Revenue*, 141 Wn.2d 139, 149, 3 P.3d 741 (2000); *Group Health Coop. of Puget Sound v. Dep't of Revenue*, 106 Wn.2d 391, 401, 722 P.2d 787 (1986); *City of Puyallup v. Pac. N.W. Bell Tel. Co.*, 98 Wn.2d 443, 448, 656 P.2d 1035 (1982); *Dep't of Revenue v. Hoppe*, 82 Wn.2d 549, 552, 512 P.2d 1094 (1973).

[44] *Hoppe*, 82 Wn.2d at 552 (construing tax cap); *see Okeson*, 150 Wn.2d at 556 (applying tax cap).

[45] *High Tide Seafoods v. State*, 106 Wn.2d 695, 698, 725 P.2d 411 (1986); *State v. Spencer*, 75 Wn. App. 118, 121, 876 P.2d 939 (1994), *review denied*, 125 Wn.2d 1015 (1995).

[46] 483 U.S. 825.

[47] 512 U.S. 374, 114 S. Ct. 2309, 129 L. Ed. 2d 304 (1994).

*Burton v. Clark County*,[48] we analyzed those cases as follows:

In our view, *Nollan, Dolan,* and their Washington progeny stand for at least four propositions. First, when the government conditions a land-use permit, it must identify a public problem or problems that the condition is designed to address. If the government can identify only a private problem, or no problem at all, the government lacks a "legitimate state interest" or "legitimate public purpose[ ]" in regulating the project. Thus, the *Nollan* Court characterized a "condition for abridgement of property rights through the police power" as "a 'substantial advanc[ing]' of a legitimate state interest." The *Dolan* Court said that to evaluate Dolan's takings claim, it had to "determine whether the 'essential nexus' exists between the 'legitimate state interest' and the permit condition exacted by the city." . . .

Second, the government must show that the development for which a permit is sought will create or exacerbate the identified public problem. This is the same as to say that there must be a relationship (nexus) between the development and the identified public problem; that the necessary relationship will exist if the development will create or exacerbate the identified problem; but that the necessary relationship will not exist if the development will not adversely impact the identified public problem. Thus, the *Nollan* Court rejected an easement that would have improved public access to the beach, even though the Commission's staff report said improved public access was needed, because the Nollans' project, replacing a bungalow with a new house, would not make the identified public problem, lack of public access, any worse than before. Similarly, the *Dolan* court rejected Tigard's exaction of a floodplain easement that would have enhanced the public's recreational opportunities, even though such opportunities were needed, because Dolan's project, a larger retail outlet, would not make the identified public problem, the public's lack of recreational opportunities, any worse than before. These holdings are consistent with the fundamental purpose of the Takings Clause, which is *not* to bar government from requiring a developer to deal with problems of the developer's own making,

---

[48] 91 Wn. App. 505, 958 P.2d 343 (1998), *review denied,* 137 Wn.2d 1015 (1999).

but which *is* "to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole."

Third, the government must show that its proposed condition or exaction (which in plain terms is just the government's proposed solution to the identified public problem) tends to solve, or at least to alleviate, the identified public problem. In other words, the government must show a relationship (nexus) between the proposed solution and the identified problem, and such relationship cannot exist unless the proposed solution has a tendency to solve or alleviate the identified problem. Thus, the *Nollan* Court rejected the exaction of an easement along the beach, even though the Nollans' new house would exacerbate the inability of passersby to see the ocean from the road, because allowing people to walk on the beach had no tendency to restore the view from the road. Interestingly, however, the *Nollan* Court would have allowed the exaction of "a viewing spot on their property for passersby with whose sighting of the ocean their new house would interfere," because an exaction of that type would have tended to restore the view from the road. The *Dolan* Court likewise rejected the exaction of an easement for a pedestrian/bike path, because the fact-finding administrative tribunal had failed to find that such an easement *would* have (as opposed to *could* have) a tendency to solve or alleviate traffic congestion. Both cases represent the idea that government acts arbitrarily and irrationally, and thus outside the scope of its police power, when it mandates a solution (i.e., a condition or exaction) that has no tendency to solve the identified problem.

Fourth, the government must show that its proposed solution to the identified public problem is "roughly proportional" to that part of the problem that is created or exacerbated by the landowner's development. . . . [T]he *Dolan* Court posed the question, "[W]hat is the required degree of connection between [1] the exactions imposed by the city and [2] the projected impacts of the proposed development." *It answered by saying that the required connection was a "reasonable relationship" best described by the term "rough proportionality," and that the government "must make some sort of individualized determination that the required dedication is related both in nature and extent to the impact of the proposed development."* . . . The

purpose, once again, is "to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole," while at the same time leaving government free to require a developer to rectify public problems insofar as the developer has created such problems.

When combined, these four propositions boil down to two relationships: a relationship between the project and the identified public problem, and a relationship between the identified public problem and the proposed solution to that problem. . . . The ultimate goal is to show that the proposed condition or exaction (i.e., the proposed solution to an identified public problem) is reasonably related to all or part of an identified public problem that arises from (i.e., is created or exacerbated by) the development project. Unless the government makes this showing, it lacks a "legitimate state interest" or a "legitimate public purpose" in imposing the condition or exaction.[49]

In *Benchmark Land Co. v. City of Battle Ground*,[50] we held that *Nollan* and *Dolan* apply to an exaction of money as well as to an exaction of land. We said:

Although the condition exacted here was money, not land, we conclude that the *Dolan* proportionality test applies. . . .

Although *Del Monte Dunes*[51] defines "exactions" as "decisions conditioning approval of development on the dedication of property," we emphasize the similarity of exacting land and money. If the government in *Nollan* and *Dolan* had exacted money rather than land and then purchased land to solve the problems, the same questions would arise: was the money exacted for and used to solve a problem connected to the proposed development? (*Nollan*.) And was the amount of money exacted roughly proportional to the development's impact on the problem? (*Dolan*.) Surely if the issues for an exaction of money are the same as for an exaction of land, the test must be the same: a showing of "nexus" and "proportionality."

---

[49] 91 Wn. App. at 520-24 (final emphasis added) (footnotes omitted).

[50] 94 Wn. App. 537, 972 P.2d 944 (1999); 103 Wn. App. 721, 14 P.3d 172 (2000), *aff'd on other grounds*, 146 Wn.2d 685, 49 P.3d 860 (2002).

[51] *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 119 S. Ct. 1624, 143 L. Ed. 2d 882 (1999).

We find no inconsistency between this analysis and the comment in *Del Monte Dunes* that *Dolan* was "inapposite." In *Del Monte Dunes*, the developer did not challenge the City's requirement that part of the land be set aside for a public beach, a buffer zone, a view corridor, and butterfly habitat. Rather, the developer claimed that the City did not intend to allow the development under any circumstances and sought to accomplish this goal through over-regulation. Thus, a *Dolan* proportionality analysis was inapposite in *Del Monte Dunes* because the government did not exact land or money.

Further, if the *Dolan* proportionality test does not apply, the government can exact conditions such as the one here with few limits. The condition advances a legitimate state interest— improving the public roads. And the condition does not deny the developer all economically viable use of its land. But the condition also seeks to force "some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." It is this attempted transfer of a public burden that calls for a *Dolan* proportionality test.[52]

■■ In this case, RCW 82.02.050(2)'s grant of authority to impose impact fees will be constitutional if RCW 82-.02.050(3)'s cap on such fees is construed to mean that impact fees must be "reasonably related to" the individualized effects of the particular project. RCW 82.02.050(2)'s grant of authority will not be constitutional if RCW 82-.02.050(3)'s cap is construed to mean that impact fees need only be "related to" the cumulative impacts of all new development, irrespective of the individualized impacts of the particular project. So that RCW 82.02.050(2) will be constitutional, we construe RCW 82.02.050(3) as requiring that impact fees be "reasonably related to" the individualized impacts of the particular project.

---

[52] 103 Wn. App. at 727-28 (citations and footnote omitted). The City argues that *Benchmark* is wrong or distinguishable, but we disagree on both counts. We note that one Washington commentator has found *Benchmark* to be "cogently reasoned," 17 WILLIAM B. STOEBUCK, WASHINGTON PRACTICE: REAL ESTATE: PROPERTY LAW § 5.5 (Supp. 2003), while another agreed in principle even before *Benchmark* was decided. Joseph D. Lee, Notes and Comments, *Sudden Impact: The Effect of* Dolan v. City of Tigard *on Impact Fees in Washington*, 71 WASH. L. REV. 205, 221 (1986) (*Dolan* "applies to all development exactions, including impact fees").

██ ██ The City relies on RCW 82.02.060,[53] and especially RCW 82.02.060(6),[54] for the proposition that impact fees are to be calculated according to the cumulative impacts of all new development, as opposed to the individualized impacts of each new development. In our view, however, RCW 82.02.060's methods of calculation are subject to RCW 82.02.050(3)'s cap. The methods of calculation were in prior bills (though not in precisely the same form), whereas the cap was a last-minute compromise crafted and promulgated by the free conference committee.

The City relies on *New Castle Investments*[55] for the proposition that the assessment imposed here was a tax that need not be "reasonably related to" the individualized impacts of Drebick's specific project. As already discussed, however, it does not matter whether the assessment imposed here was a tax or a fee. Either way, it must comply with RCW 82.02.050 through 82.02.090,[56] including the cap in RCW 82.02.050(3).[57]

---

[53] RCW 82.02.060 states in part that a local ordinance by which impact fees are imposed "[s]hall include a schedule of impact fees which shall be adopted for each type of development activity that is subject to impact fees, specifying the amount of the impact fee to be imposed for each type of system improvement. The schedule shall be based on a formula or other method of calculating such impact fees." This language speaks to the amount to be assessed and collected from each type of development activity for each type of system improvement. It does not, however speak to the amount that any particular project is to pay.

[54] RCW 82.02.060(6) provides that a local ordinance by which impact fees are imposed "[s]hall establish one or more reasonable service areas within which it shall calculate and impose impact fees for various land use categories per unit of development." Except for "impact fees," the legislature did not define any of these terms. Given that RCW 82.02.060 is subject to the cap in RCW 82.02.050(3), we need not wrestle with the meaning of these terms.

[55] *New Castle v. City of LaCenter*, 98 Wn. App. 224, 989 P.2d 569 (1999), *review denied*, 140 Wn.2d 1019 (2000).

[56] RCW 82.02.020.

[57] We do not overlook the following dictum in *New Castle*: "Although impact fees must be 'reasonably related' to the impact of new development on the public infrastructure, they are not individually calculated for each new development, but rather are based on a general calculation that applies to all new development." 98 Wn. App. at 234. This statement was not necessary to our decision and is not binding precedent. *DCR, Inc. v. Pierce County*, 92 Wn. App. 660, 683 n.16, 964 P.2d 380 (1998) (" 'Statements in a case that do not relate to an issue before the court and are unnecessary to decide the case constitute obiter dictum, and need not be followed.' ") (quoting *State v. Potter*, 68 Wn. App. 134, 149 n.7, 842 P.2d 481

The City relies on *Wellington River Hollow, L.L.C. v. King County*,[58] but that case is distinguishable. The question there was whether a municipality had complied with the requirements of its own ordinance. The question here concerns the requirements of state law.

Relying on RCW 64.40.020,[59] Drebick requests costs and reasonable attorney fees. He has not met the predicates of that statute, so we deny his request.[60]

In conclusion, we reverse the superior court and remand for the City to impose an impact fee using any of the methods in RCW 82.02.060, provided that such fee shall not exceed the individualized impacts of Drebick's specific project.

HUNT, C.J., and SEINFELD, J., concur.

---

(1992)), *cert. denied,* 529 U.S. 1053 (2000); *Concerned Coupeville Citizens v. Town of Coupeville,* 62 Wn. App. 408, 416, 814 P.2d 243, *review denied,* 118 Wn.2d 1004 (1991). In any event, this statement is consistent with today's ruling once it is understood that the "general calculation" is made pursuant to RCW 82.02.060, and that RCW 82.02.060 is subject to the cap in RCW 82.02.050(3). *New Castle* did not concern a cap, much less the relationship between a cap and RCW 82.02.060's methods of calculation. ·

[58] 113 Wn. App. 574, 54 P.3d 213 (2002), *review denied,* 149 Wn.2d 1014 (2003).

[59] RCW 64.40.020 provides in part:

(1) Owners of a property interest who have filed an application for a permit have an action for damages to obtain relief from acts of an agency which are arbitrary, capricious, unlawful, or exceed lawful authority, or relief from a failure to act within time limits established by law: PROVIDED, That the action is unlawful or in excess of lawful authority only if the final decision of the agency was made with knowledge of its unlawfulness or that it was in excess of lawful authority, or it should reasonably have been known to have been unlawful or in excess of lawful authority.

(2) The prevailing party in an action brought pursuant to this chapter may be entitled to reasonable costs and attorney's fees.

[60] This ruling is limited to costs and fees on appeal and does not affect proceedings stayed below.