Maxa, J.
¶ 1 Snohomish County, King County, and the Building Industry Association of Clark County (collectively appellants) appeal the Pollution Control Hearings Board’s (Board) order holding that condition S5.C.5.a.iii in the 2013-2018 Phase I Municipal Stormwater Permit (the 2013-2018 Permit) issued by the Washington Department of Ecology does not violate the vested rights of property developers. The 2013-2018 Permit requires Phase I permit-tees, which include certain counties and cities, to adopt by June 30, 2015 regulations for controlling stormwater drainage and runoff to municipal stormwater sewer systems for new development, redevelopment, and construction activities. Condition S5.C.5.a.iii provides that the new regulations will apply to all development applications submitted after July 1, 2015 and submitted before July 1, 2015 if construction is not started by June 30, 2020.
¶2 The statutory vested rights doctrine provides that a land use application generally must be considered under the zoning or other land use control ordinances in effect at the time the application was submitted. The appellants argue that enforcement of condition S5.C.5.a.iii would require permittees to violate the vested rights of developers *323 because (1) the required stormwater regulations are land use control ordinances, (2) an application submitted before July 1, 2015 might not result in the start of construction by June 2020, and (3) condition S5.C.5.a.iii therefore might require counties to enforce stormwater regulations adopted after an application is submitted.
¶3 Ecology and Puget Soundkeeper Alliance (PSA) (collectively Ecology) argue, and the Board ruled, that the 2013-2018 Permit would not require permittees to violate the vested rights doctrine because the required regulations are environmental regulations, not land use control ordinances. They also argue that even if the regulations are land use control ordinances, federal law preempts Washington’s vested rights statutes.
¶4 We hold that (1) the 2013-2018 Permit’s required stormwater regulations are “land use control ordinances” under the vested rights statutes, (2) enforcement of condition S5.C.5.a.iii would violate the statutory vested rights of developers who submit applications before July 1, 2015 but do not begin construction until after June 30, 2020, and (3) federal law does not preempt Washington’s vested rights statutes. Accordingly, we reverse the Board’s order and remand to the Board to direct Ecology to revise condition S5.C.5.a.iii to specify that the 2013-2018 Permit applies only to those completed applications submitted after July 1, 2015.
FACTS
¶5 The federal Clean Water Act (CWA)[1] prohibits any discharge of pollutants into the nation’s waters, unless the discharge is made according to the terms of a permit issued under the National Pollution Discharge Elimination System (NPDES). 33 U.S.C. §§ 1311(a), 1342. The federal Environmental Protection Agency (EPA) may issue NPDES *324 permits, but it may also delegate the authority to issue permits to a state agency. 33 U.S.C. § 1342(a)(1), (b). In Washington, EPA has delegated the authority to issue NPDES permits to Ecology. See RCW 90.48.260.

2013 Municipal Stormwater Permit

¶6 In August 2012, Ecology issued the 2013-2018 Phase I Municipal Stormwater Permit.[2] The 2013-2018 Permit authorizes and regulates the discharge of stormwater to surface waters and to groundwaters from large and medium municipal separate storm sewer systems, referred to as MS4s.[3] Snohomish County, King County, Pierce County, Clark County, and the cities of Seattle and Tacoma are among the entities that are permittees under the 2013-2018 Permit.[4] The 2013-2018 Permit is effective from August 1, 2013 through July 31, 2018.
¶7 Ecology implements the 2013-2018 Permit at the local level by mandating that each local permittee be responsible for compliance with the 2013-2018 Permit’s terms. The 2013-2018 Permit requires all permittees to create a stormwater management program. That program must include the enactment of local ordinances or other governing documents regulating development within each permit-tee’s jurisdiction. The 2013-2018 Permit requires several conditions that permittees must implement through their ordinances. Condition S5.C.5 is one such condition.
¶8 Condition S5.C.5 focuses on preventing and controlling stormwater runoff from new development, redevelopment, and construction activities. This condition applies to *325 those projects that meet certain thresholds specified in appendix 1 of the 2013-2018 Permit[5] and that will discharge stormwater into an applicable sewer system.
¶9 Condition S5.C.5 includes a lengthy set of minimum performance measures, one of which includes site and subdivision scale requirements implementing the “[m] ini-mum [r]equirements, thresholds, and definitions” in appendix 1 of the 2013-2018 Permit for new development, redevelopment, and construction sites. Site and subdivision scale requirements that developers must implement include preparing stormwater site plans; drafting stormwater pollution prevention plans; utilizing all known, available, and reasonable source control best management practices; maintaining natural drainage patterns to the maximum extent practicable; and implementing on-site stormwater management best management practices to the extent feasible in various contexts. In addition, certain projects trigger additional minimum requirements that developers must comply with. These include constructing stormwater treatment facilities to treat stormwater runoff, implementing flow control standards to reduce the impacts of stormwater runoff, ensuring that projects draining into wetlands comply with various guide sheets and construction restrictions, and maintaining an operation and maintenance manual.
¶10 Condition S5.C.5.a.iii provides that permittees must adopt and make effective a stormwater management program that meets the 2013-2018 Permit requirements no later than June 30, 2015. The second sentence of the condition addresses the applicability of the new program to development projects:
The local program adopted to meet the requirements of S5.C.5.a.i through ii shall apply to all applications submitted after July 1,2015 and shall apply to projects approved prior [to] *326 July 1, 2015, which have not stalled, construction by June 30, 2020.
Certified Appeal Bd. R. at 27 (emphasis added) (footnotes omitted).

Procedural History

¶11 Snohomish County, King County, Pierce County, Clark County, and the Building Industry Association of Clark County appealed the 2013-2018 Permit to the Board.[6] They argued in part that the 2013-2018 Permit’s requirements were land use control ordinances and that condition S5.C.5.a.iii conflicted with Washington’s vested rights and finality laws. Ecology argued that the requirements under the 2013-2018 Permit were environmental regulations that were necessary to comply with the federal CWA and state Water Pollution Control Act,[7] and therefore did not implicate the vested rights doctrine.
¶12 In October 2013, the Board issued a summary judgment order ruling that the 2013-2018 Permit’s requirements were environmental regulations and therefore that condition S5.C.5.a.iii did not violate Washington’s vested rights doctrine or finality doctrine. The Board stated that it “has consistently ruled that the requirements imposed by NPDES stormwater permits are not land use control ordinances that are subject to state vesting laws.” Clerk’s Papers (CP) at 56. Moreover, the Board rejected the notion that the doctrines of vested rights and finality of land use decisions could control and limit the application of state and federal water quality requirements.
¶13 However, the Board’s summary judgment order did require Ecology to modify the second sentence of condition *327 S5.C.5.a.iii. The Board directed Ecology to replace the phrase “projects approved” with “application submitted.”
¶14 Following a trial on the remaining issues in the case, the Board issued its final decision and order. The appellants separately appealed the Board’s October 2013 decision to the Thurston County Superior Court. The superior court consolidated the appeals. The appellants sought direct review, which this court granted.
ANALYSIS
A. Standard of Review
 ¶15 The Administrative Procedure Act (APA) governs our review of board decisions. See RCW 34.05-.570(l)(b); Cornelius v. Dep’t of Ecology, 182 Wn.2d 574, 584-85, 344 P.3d 199 (2015). We apply the APA to the administrative record. Cornelius, 182 Wn.2d at 585. We may grant relief from an order based on several reasons listed in RCW 34.05.570(3), including that the order is (1) outside the statutory authority of the agency, and (2) based on an erroneous interpretation or application of the law. RCW 34.05.570(3)(b), (d). The burden of demonstrating the invalidity of agency action is on the party asserting invalidity. RCW 34.05.570(l)(a).
¶16 We review questions of law de novo. Cornelius, 182 Wn.2d at 585. When a statute is ambiguous and falls within Ecology’s area of expertise, we give great weight to Ecology’s interpretation if it is consistent with the statutory language. Clark County v. Rosemere Neigh. Ass’n, 170 Wn. App. 859, 871, 290 P.3d 142 (2012). However, we are not bound by an agency’s interpretation of a statute. See RCW 34.05.570(3)(d); see also Postema v. Pollution Control Hr’gs Bd., 142 Wn.2d 68, 77, 11 P.3d 726 (2000). The Board’s order was made on summary judgment, which we also review de novo. Cornelius, 182 Wn.2d at 585.
*328 B. Conflict Between Condition S5.C.5.a.iii and Vested Rights Doctrine
¶17 The appellants challenge the second sentence of condition S5.C.5.a.iii, which requires permittees to apply the new stormwater regulations to property development applications filed before July 1, 2015 if construction on those projects has not started by June 30, 2020. The appellants focus specifically on the application of the new stormwater regulations to local building permit and subdivision applications and development agreements. They argue that condition S5.C.5.a.iii conflicts with the statutory vested rights doctrine. We agree.
1. Vested Rights Doctrine
 ¶18 The vested rights doctrine generally provides that certain land development applications must be processed under the land use regulations in effect when the application was submitted, regardless of subsequent changes to those regulations. Town of Woodway v. Snohomish County, 180 Wn.2d 165, 172-73, 322 P.3d 1219 (2014). Development rights “vest” on a date certain - when a complete development application is submitted. Id. The purpose of the vested rights doctrine is to provide certainty to developers and to provide some protection against fluctuating land use policy. Noble Manor Co. v. Pierce County, 133 Wn.2d 269, 278, 943 P.2d 1378 (1997). The doctrine recognizes that development rights are valuable property interests and ensures that new land use regulations do not interfere with those rights. Town of Woodway, 180 Wn.2d at 173.
¶19 The vested rights doctrine originated at common law, but the legislature has codified the doctrine with regard to building permits (RCW 19.27.095(1)), subdivision applications (RCW 58.17.033(1)), and development agree- *329 merits (RCW 36.70B.180).[8] Town of Woodway, 180 Wn.2d at 173. RCW 19.27.095(1) provides that a valid and fully complete building permit application “shall be considered under the building permit ordinance in effect at the time of application, and the zoning or other land use control ordinances in effect on the date of application.” RCW 58.17-.033(1) provides that a proposed division of land “shall be considered under the subdivision or short subdivision ordinance, and zoning or other land use control ordinances, in effect on the land at the time a fully completed application for preliminary plat approval of the subdivision, or short plat approval of the short subdivision, has been submitted to the appropriate county, city, or town official.” And RCW 36.70B.180 provides that a development agreement is not subject to an amended or new “zoning ordinance or development standard or regulation adopted after the effective date of the agreement.”
¶20 The issue here is whether the 2013-2018 Permit’s required stormwater regulations constitute “other land use control ordinances” under RCW 19.27.095(1) and RCW 58.17.033(1) and/or “development standardly] or regulation[s]” under RCW 36.70B.180. If so, the statutory vested rights doctrine applies to those stormwater regulations. If not, the vested rights doctrine does not apply.
2. Principles of Statutory Construction
¶21 Determining whether the statutory vested rights doctrine applies to the 2013-2018 Permit’s required storm-water regulations involves the interpretation of the perti *330 nent statutory language. Statutory interpretation is a matter of law that we review de novo. Jametsky v. Olsen, 179 Wn.2d 756, 761, 317 P.3d 1003 (2014).
¶22 The goal of statutory interpretation is to determine and give effect to the legislature’s intent. Id. at 762. To determine legislative intent, we first look to the plain language of the statute. Id. We consider the language of the provision in question, the context of the statute in which the provision is found, and related statutes. Protect the Peninsula’s Future v. Growth Mgmt. Hr’gs Bd., 185 Wn. App. 959, 969, 344 P.3d 705 (2015). Undefined terms are given their plain and ordinary meaning, which can be derived from a dictionary. Estate of Haselwood v. Bremerton Ice Arena, Inc., 166 Wn.2d 489, 498, 210 P.3d 308 (2009). If a statute is unambiguous, we apply the statute’s plain meaning as an expression of legislative intent without considering other sources of such intent. Jametsky, 179 Wn.2d at 762.
 ¶23 If the plain language of the statute is susceptible to more than one reasonable interpretation, the statute is ambiguous. Id. We resolve ambiguity by considering other indications of legislative intent, including principles of statutory construction, legislative history, and relevant case law. Id.
3. Statutory Language: Land Use Control Ordinances
¶24 RCW 19.27.095(1) and RCW 58.17.033(1) both provide that building permit and land division applications must be considered under the “zoning or other land use control ordinances” in effect at the time the application is submitted. Neither statute defines the term “land use control ordinance.” However, the appellants rely on Washington cases that do define the term and on this court’s holding in Westside Business Park, LLC v. Pierce County, 100 Wn. App. 599, 607, 5 P.3d 713 (2000) to support their contention that stormwater drainage ordinances are land use control ordinances.
*331 a. New Castle and Westside
¶25 In New Castle Investments v. City of LaCenter, this court first discussed the meaning of “land use control ordinance” in RCW 58.17.033(1). 98 Wn. App. 224, 228, 989 P.2d 569 (1999). We focused on the word “control,” which is defined in part as “ ‘ [t] he ability to exercise a restraining or directing influence over something.’ ” Id. at 229 (quoting Black’s Law Dictionary 329 (6th ed. 1990)). Accordingly, we suggested that a land use control ordinance was one that “exercise [d] a restraining or directing influence over land use.” New Castle, 98 Wn. App. at 229. This court subsequently adopted this definition of land use control ordinance in Westside, 100 Wn. App. at 607. Division One of this court also has adopted this definition. Graham Neigh. Ass’n v. F.G. Assocs., 162 Wn. App. 98, 115, 252 P.3d 898 (2011).
¶26 In New Castle, we addressed whether an ordinance imposing a transportation impact fee (TIF) on a proposed subdivision was a land use control ordinance subject to the vesting rights provision of RCW 58.17.033. 98 Wn. App. at 226-27. We stated that TIFs do not exercise a controlling or restraining influence over land use; they only increase the cost of a development. Id. at 229. Further, we explained:
The TIFs do not affect the physical aspects of development (i.e., building height, setbacks, or sidewalk widths) or the type of uses allowed (i.e., residential, commercial, or industrial). If they did, then TIFs would be subject to the vested rights doctrine. In other words, “[the developer] is not being forced to use its land or build differently from that which [the developer] was able to do at the time its plans were approved.”
Id. at 237 (quoting Lincoln Shiloh Assocs. v. Mukilteo Water Dist., 45 Wn. App. 123, 128, 724 P.2d 1083 (1986)). We concluded:
Because TIFs do not “control” land use, do not affect the developer’s rights with regard to the physical use of his or her land, and are best characterized as revenue raising devices *332 rather than land use regulation, we hold that the definition of “land use control ordinances” does not include TIFs.
Id. at 237-38.
¶27 In Westside, we addressed an issue very similar to the one here - whether an ordinance imposing increased stormwater drainage requirements was a land use control ordinance subject to the vesting rights provision of RCW 58.17.033. 100 Wn. App. at 602. After relying on New Castle to define “land use control ordinance” as an ordinance that exerts a restraining or directing influence over land use, we stated:
Storm water drainage ordinances are land use control ordinances. Under RCW 58.17.060, local governments may approve a short subdivision only if they enter written findings in support, as provided in RCW 58.17.110. RCW 58.17.110(1) requires, as a prerequisite to subdivision approval written findings that “appropriate provisions are made for [inter aha] drainage ways[.]” As a mandatory prerequisite to short subdivision approval, storm water drainage ordinances do exert a “restraining or directing influence” over land use and are therefore land use control ordinances.
Westside, 100 Wn. App. at 607 (emphasis added) (alterations in original).
¶28 We also relied on Phillips v. King County, 136 Wn.2d 946, 963, 968 P.2d 871 (1998), where the Supreme Court stated that the vested rights doctrine applied to surface water drainage regulations. Westside, 100 Wn. App. at 607. We stated that “because the Phillips court plainly considered whether surface water drainage ordinances are within the ambit of the vested rights doctrine, ... we are not prepared to say that storm water drainage ordinances are not subject to the vesting rule.” Id. at 607-08.
¶29 Ecology essentially ignores Westside. And PSA argues that the discussion in Westside regarding the definition of “land use control ordinance” is dicta and the case neither controls nor is informative here because the decid *333 ing issue was the adequacy of an application to invoke vesting.[9] However, even if our discussion of the meaning of “land use control ordinance” in Westside was dicta, PSA does not explain why we should disregard the adoption of a definition of that term in New Castle, which we cited with approval in Westside.
¶30 Here, there is no indication that the effect of the stormwater regulations the 2013-2018 Permit requires would be appreciably different than the stormwater drainage ordinances discussed in Westside. Therefore, in the absence of some reason to treat the regulations adopted pursuant to the 2013-2018 Permit differently than other stormwater drainage ordinances, we hold that Westside is controlling authority.
¶31 Further, the type of stormwater ordinances required under the 2013-2018 Permit clearly would satisfy Westside’s definition of “land use control ordinance.” The 2013-2018 Permit requirements by their very design are intended to exert a restraining and directing influence over the development and redevelopment of land to effectuate Ecology’s regulation of stormwater discharges into Washington’s waters. Certain project developers must comply with local ordinances enacted under the 2013-2018 Permit requiring, for example, that they utilize source control best management practices, implement on-site stormwater best management practices, and implement flow control standards to reduce the impacts of stormwater runoff. These and other 2013-2018 Permit requirements would significantly curtail how developers use their land.
b. Ecology Arguments
¶32 Ecology argues that stormwater regulations adopted as required in the 2013-2018 Permit are not land use *334 control ordinances for several reasons. First, Ecology argues that because the 2013-2018 Permit’s required regulations are environmental regulations, they cannot be considered land use control ordinances. Ecology points out that the purpose of the regulations adopted pursuant to the 2013-2018 Permit is to control pollution discharges, not control the use of land. The Board’s summary judgment order also focused on the purpose of the regulations at issue:
The conditions that are imposed pursuant to the Phase I and Phase II Permits exist and are designed to address pollution, not to control the use of land. The authority for these conditions is contained in state and federal environmental laws, not any land use-related statute. The requirement to use various best management practices to control stormwater runoff from new development or redevelopment,.. . does not change the type of use the land may be put to (residential, commercial, etc[.]), nor is it a tool to regulate the subdivision of land. Rather, the requirements of the Phase I and II Permits are, by their nature, aimed at improving the quality of the environment and the beneficial uses of the state’s waters for the public at large.
CP at 57-58.
¶33 Ecology’s argument seems to be based on the assumption that a regulation can either be an environmental regulation or a land use control regulation, but not both. However, Ecology does not cite any case authority for this proposition. And several cases address the application of the vested rights doctrine to regulations that can be classified as “environmental.” See, e.g., Lauer v. Pierce County, 173 Wn.2d 242, 258-63, 267 P.3d 988 (2011) (watercourse buffer regulations); Phillips, 136 Wn.2d at 951 (water drainage regulations); Julian v. City of Vancouver, 161 Wn. App. 614, 619, 626-28, 255 P.3d 763 (2011) (riparian buffer regulations); Westside, 100 Wn. App. at 601 (storm drainage regulations adopted in part as a response to the CWA). Nothing in Washington case law suggests that simply characterizing a land use control ordinance as an environ *335 mental ordinance limits the application of the vested rights doctrine.
¶34 Ecology emphasizes that the Board has held that NPDES permit requirements do not constitute land use control ordinances. See Rosemere Neigh. Ass’n v. Dep’t of Ecology, No. 10-013, 2010 WL 3420570, 2010 WA ENV LEXIS 31 (Wash. Pollution Control Hr’gs Bd. Aug. 26, 2010), aff’d sub nom. Rosemere Neigh. Ass’n, 170 Wn. App. at 875-76 (refraining from addressing the legal vesting issue); Cox v. Dep’t of Ecology, No. 08-077, 2009 WL 542494 (Wash. Pollution Control Hr’gs Bd. Feb. 26, 2009). However, we are not bound by an agency’s interpretation of a statute. Postema, 142 Wn.2d at 77. Here, the Board’s rulings are inconsistent with the language of the vested rights statutes, which do not carve out an exception for environmental regulations, and applicable case law.
¶35 Second, Ecology quotes language from New Castle that “ ‘[t]he vested rights rule is generally limited to those laws which can loosely be considered “zoning” laws.’ ” 98 Wn. App. at 232 (quoting 6 Wash. State Bar Ass’n, Washington Real Property Deskbook § 97.8(2)(d) (3d ed. 1996)). Ecology argues that environmental regulations do not resemble zoning laws. Although we quoted the same language in Westside, we then noted that the vested rights doctrine “has also been extended beyond zoning-type laws.” 100 Wn. App. at 607. And the definition of “land use control ordinance” in Westside focused on the effect of an ordinance on land use, not on any similarity to zoning laws. Id. Further, RCW 19.27.095(1) and RCW 58.17.033(1) both refer to “zoning or other land use control ordinances.” This language clearly establishes that a land use control ordinance is different than a zoning ordinance.
¶36 Third, Ecology argues that the purpose of the vested rights doctrine is only to limit the exercise of municipal discretion, rather than limiting the state’s ability to implement environmental regulations necessary to comply with *336 state and federal water pollution laws. Ecology relies on Erickson & Assocs. v. McLerran, where the Supreme Court recognized that
[o]ur vested rights doctrine is not a blanket rule requiring cities and towns to process all permit applications according to the rules in place at the outset of the permit review. Instead, the doctrine places limits on municipal discretion and permits landowners or developers “to plan their conduct with reasonable certainty of the legal consequences.”
123 Wn.2d 864, 873, 872 P.2d 1090 (1994) (quoting W. Main Assocs. v. City of Bellevue, 106 Wn.2d 47, 51, 720 P.2d 782 (1986)). Ecology states that permittees do not exercise municipal discretion when they implement environmental conditions imposed by the State to meet water pollution laws.
¶37 However, Erickson does not stand for the proposition that the vested rights doctrine applies only to limit municipal discretion and cannot apply to environmental requirements enacted pursuant to state direction. The language quoted above addressed an ordinance that determined the vesting date of certain permits, not land use control ordinances. Erickson, 123 Wn.2d at 869-71. And Ecology cites to no authority holding that the vested rights statutes do not apply to local regulations that are state mandated.[10] Those statutes broadly apply to land use control ordinances without any exception for ordinances mandated by state or federal law. See Westside, 100 Wn. App. at 601 (recognizing a vested right to the application of the predecessor to stormwater drainage ordinances adopted in response to the CWA).
¶38 Fourth, Ecology argues that controlling water pollution is an exercise of a local municipality’s police powers, *337 which extinguishes a developer’s vested right. Ecology quotes a 1905 case stating that “[t]here is no such thing as an inherent or vested right to imperil the health or impair the safety of the community.” City of Seattle v. Hinckley, 40 Wash. 468, 471, 82 P. 747 (1905). Ecology also relies on Rhod-A-Zalea & 35th, Inc. v. Snohomish County, 136 Wn.2d 1, 6, 959 P.2d 1024 (1998), where the Supreme Court addressed whether a nonconforming peat mining operation was subject to a county’s police power regulations enacted for the health, safety, and welfare of the community. The court held that the peat mining operation was subject to subsequent police power regulations and that local governments may “preserve, regulate and even, within constitutional limitations, terminate nonconforming uses.” Id. at 8. Ecology emphasizes that the court suggested that a nonconforming factory would not be exempt from later enacted pollution regulations. Id. at 15.
¶39 However, Ecology did not argue below that the stormwater regulations may be enacted pursuant to a municipality’s police powers. And the Board did not address this issue. Therefore, whether a local municipality could impose police power conditions on a development application is not before us. The only issue on appeal is the application of the vested rights doctrine.
¶40 Fifth, Ecology argues that it could require permit-tees to use their authority under the State Environmental Policy Act (SEPA), ch. 43.21C RCW, to enforce stormwater discharge regulations. SEPA regulations are exempt from the vested rights doctrine. RCW 19.27.095(6); RCW 58.17-.033(3). However, once again Ecology did not argue below that it was requiring permittees to enact regulations pursuant to SEPA. And the Board did not base its decision on SEPA. Therefore, whether a local municipality could enact certain regulations under SEPA that would not be subject to the vested rights doctrine is not before us.
¶41 Sixth, Ecology argues that applying the vested rights doctrine here would conflict with the legislature’s intent, expressed in RCW 90.48.010, to “maintain the highest possible standards to insure the purity of all waters of the state *338 . . . , and to that end require the use of all known available and reasonable methods by industries and others” to control water pollution. However, as noted above, RCW 19.27.095(6) and RCW 58.17.033(3) do not contain any exception for environmental regulations. And Ecology has not cited to any expression of a legislative intent to have NPDES permit requirements supersede the vested rights doctrine. Further, to the extent that RCW 90.48.010 and the vested rights statutes conflict, the more general policy statement in RCW 90.48.010 must yield to the more specific vested rights statutes. See Ass’n of Wash. Spirits & Wine Distribs. v. Wash. State Liquor Control Bd., 182 Wn.2d 342, 356, 340 P.3d 849 (2015) (a general statutory provision must yield to a more specific provision).
c. Summary
¶42 Under a plain reading of RCW 19.27.095(1) and RCW 58.17.033(1), in combination with our case law interpreting these provisions, regulations enacting the 2013-2018 Permit requirements constitute local land use ordinances because the regulations will restrain and direct the use of land. Because development rights vest upon filing a completed building or land division application, condition S5.C.5.a.iii conflicts with the vested rights doctrine as stated in RCW 19.27.095(1) and RCW 58.17.033(1) because it could require a permittee to enforce regulations adopted after development rights had been vested. Accordingly, we hold that condition S5.C.5.a.iii of the 2013-2018 Permit is invalid.
4. Statutory Language: Development Standards and Regulations
¶43 RCW 36.70B.180 provides that a development agreement is not subject to an amended or new “zoning ordinance or development standard or regulation adopted after the effective date of the agreement.” The statute does *339 not define “development standard or regulation.” And there are no cases or statutes that define this term. However, the ordinary meaning of “development regulation” is a regulation that affects the development of land. Using this meaning, there is no reason to interpret development regulation differently than land use control ordinance. Similarly, the ordinary meaning of “development standards” is a standard that affects the development of land. Although “standard” may have a narrower meaning than “regulation,” again there is no reason to interpret development standards differently than land use control ordinances.
¶44 We hold that under a plain reading of RCW 36.70B.180, local regulations enacting the 2013-2018 Permit requirements constitute development regulations and development standards. Accordingly, we hold that condition S5.C.5.a.iii conflicts with the vested rights doctrine as stated in RCW 36.70B.180, and therefore is invalid.[11]
5. Remedy
¶45 We hold that condition S5.C.5.a.iii of the 2013-2018 Permit conflicts with RCW 19.27.095(1), RCW 58.17.033(1), and RCW 36.70B.180. The appellants contend that this holding requires us to find that condition S5.C.5.a.iii is invalid because the Washington legislature did not provide Ecology with the authority to compel permittees to violate Washington law and to do so would be unreasonable. We agree.
 ¶46 An administrative regulation that conflicts with a statute is invalid. See Cannabis Action Coal. v. City of Kent, 180 Wn. App. 455, 481, 322 P.3d 1246 (2014) aff’d, 183 Wn.2d 219, 351 P.3d 151 (2015). Such a conflict exists when an ordinance permits what state law forbids or for *340 bids what state law permits. Id. at 482. “ ‘The conflict must be direct and irreconcilable with the statute, and the ordinance must yield to the statute if the two cannot be harmonized.’” Id. (quoting City of Tacoma v. Luvene, 118 Wn.2d 826, 835, 827 P.2d 1374 (1992)).
¶47 Here, condition S5.C.5.a.iii requires that permittees apply the new 2013-2018 Permit requirements to completed building and subdivision permit applications and executed development agreements that were submitted before July 1,2015 that have not started construction by June 30,2020. The vesting rights statutes provide that certain land development projects must be processed under the land use or development regulations in effect at the time the completed building or land division application is submitted or the effective date of the development agreement regardless of when construction starts. Therefore, there is a direct conflict between the condition and the statutory provisions because condition S5.C.5.a.iii requires imposition of new regulations on those applications and agreements that had development rights vested before the new regulations were adopted.
¶48 The proper remedy is to reverse the Board’s order and remand to the Board to direct Ecology to revise condition S5.C.5.a.iii to specify that the 2013-2018 Permit applies only to those completed applications submitted after permittees adopted the new permit requirements. See Puget Soundkeeper All. v. State, 189 Wn. App. 127, 131, 152, 356 P.3d 753 (2015) (reversing board order and remanding to Ecology to revise permit condition).
C. Federal Preemption
¶49 Ecology argues that even if Washington’s vested right doctrine applies to the 2013-2018 Permit’s required regulations, the federal CWA preempts that doctrine. Ecology contends that preemption applies here because the application of the vested rights doctrine to the 2013-2018 Permit requirements would prevent accomplishing the pur *341 poses and objectives of Congress. We disagree and hold that the CWA does not preempt Washington’s vested rights doctrine.
1. Legal Principles
¶50 The supremacy clause of the United States Constitution gives the federal government the power to preempt state law. Hillman v. Maretta, _ U.S. _, 133 S. Ct. 1943, 1949, 186 L. Ed. 2d 43 (2013). “Conflict preemption” occurs when (1) federal and state laws conflict, making compliance with both an impossibility, or (2) state law “ ‘stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.’ ” Id. at 1950 (quoting Hines v. Davidowitz, 312 U.S. 52, 67, 61 S. Ct. 399, 85 L. Ed. 581 (1941)). “[S]tate laws are not superseded by congressional legislation unless that is the clear and manifest purpose of Congress.” McKee v. AT&T Corp., 164 Wn.2d 372, 387, 191 P.3d 845 (2008). Courts should not seek out conflict where none actually exists. Chevron U.S.A., Inc. v. Hammond, 726 F.2d 483, 499 (9th Cir. 1984).
¶51 Significantly, there is a strong presumption against preemption under Washington law. Nw. Wholesale, Inc. v. Pac Organic Fruit, LLC, 184 Wn.2d 176, 184, 357 P.3d 650 (2014), pet. for cert. filed sub nom. Ostenson v. Holzman, 84 U.S.L.W. (U.S. Dec. 9, 2015) (No. 15-763). “Preemption is the exception, not the rule in Washington.” Hisle v. Todd Pac. Shipyards Corp., 151 Wn.2d 853, 864, 93 P.3d 108 (2004).
¶52 We review federal preemption issues de novo. Wal-Mart Stores, Inc. v. United Food & Commercial Workers Int’l Union, 190 Wn. App. 14, 21, 354 P.3d 31 (2015).
2. No Direct Conflict Between State and Federal Law
 ¶53 Washington’s vested rights doctrine does not directly conflict with the CWA. The CWA does not provide that state agencies must require local municipalities to enact certain stormwater regulations applicable to *342 land development. Instead, Congress has delegated implementation of general pollution control guidelines to the states. As a result, the requirements of condition S5.C.5.a.iii reflect Ecology’s interpretive choices meant to effectuate a framework of federal and state environmental guidelines. Further, there is no counterpart to condition S5.C.5.a.iii in the CWA. And nothing in the CWA requires that storm-water regulations be applied within a set deadline. Accordingly, we hold that the CWA does not directly conflict with Washington’s vested rights doctrine.
3. Obstacle to Congressional Objectives
¶54 Ecology argues that the second prong of conflict preemption applies here. To determine whether this prong applies, we must determine the purposes and objectives of Congress that are embodied in the CWA and determine whether the vested rights doctrine stands as an obstacle to the accomplishment of those objectives. Beatty v. Fish & Wildlife Comm’n, 185 Wn. App. 426, 454, 341 P.3d 291, review denied, 183 Wn.2d 1004 (2015). “The obstruction strand of conflict preemption focuses on both the objective of the federal law and the method chosen by Congress to effectuate that objective.” McKee, 164 Wn.2d at 388.
a. Objective of CWA
¶55 The CWA is a comprehensive water quality statute with the stated goal of “restoring] and maintain [ing] the chemical, physical, and biological integrity of the Nation’s waters” and achieving or maintaining “water quality which provides for the protection and propagation of fish, shellfish, and wildlife.” 33 U.S.C. §1251(a)(2). Under the statute, the administrator of EPA is charged with the responsibility of “establish[ing] and enforcing] technology-based limitations on individual discharges into the country’s navigable waters from point sources.” PUD No. 1 of Jefferson County v. Wash. Dep’t of Ecology, 511 U.S. 700, 704, 114 S. Ct. 1900, 128 L. Ed. 2d 716 (1994) (citing 33 U.S.C. §§ 1311, 1314). *343 The states also are required to provide water quality standards, which may be more stringent than the federal standards but cannot be less protective than the federal standards. Jefferson County, 511 U.S. at 705; 33 U.S.C. § 1370.
¶56 The key provision of the CWA regarding stormwater pollution is 33 U.S.C. § 1342(p)(3)(B)(iii), which states that permits issued for discharges from municipal storm sewers “shall require controls to reduce the discharge of pollutants to the maximum extent practicable.” Ecology argues that the stormwater requirements in the 2013-2018 Permit will reduce the discharge of pollutants to the maximum extent practicable, and therefore allowing the vested rights doctrine to prevent application of these requirements to certain developments would be an obstacle to the accomplishment of the objectives of 33 U.S.C. § 1342(p)(3)(B)(iii).
¶57 However, 33 U.S.C. § 1342(p)(3)(B)(iii) does not require controls to reduce the discharge of pollutants to the maximum extent possible. Congress used the word “practicable.” 33 U.S.C. § 1342(p)(3)(B)(iii). This language necessarily provides some flexibility to the states in adopting stormwater control regulations. Consistent with 33 U.S.C. § 1342(p)(3)(B)(iii), a state may legitimately determine that it is not “practicable” to impose new NPDES permit requirements on those projects with development applications that have already vested under state law.
¶58 Further, as noted above, the CWA contains no timeline for adopting controls to reduce the discharge of pollutants. The absence of any directive requiring the adoption of new regulations within a specific time frame necessarily provides some flexibility to the states in implementing stormwater control regulations. Ecology itself recognized this flexibility by delaying the application of the 2013-2018 Permit requirements until 2020 for development applications filed before July 1, 2015. Ecology does not suggest that this five year delay violates 33 U.S.C. § 1342(p)(3)(B)(iii) or interferes with Congressional objec *344 tives. If delaying the application of2013-2018 Permit requirements until 2020 for some developments is acceptable under federal law, we cannot agree that delaying the application of 2013-2018 Permit requirements for a few more years in the present context to fully protect vested development rights interferes with Congressional objectives.
b. Method Chosen by Congress
¶59 In enacting the CWA, Congress chose not to adopt rigid requirements for the immediate elimination of the discharge of pollutants to stormwater collection systems. Instead, Congress developed the NPDES permit program to gradually reduce such discharges. This choice suggests that some delay in the implementation of NPDES permit requirements would not necessarily prevent the accomplishment of Congress’s broad purposes and objectives. As the United States Supreme Court noted, “By establishing a permit system for effluent discharges, Congress implicitly has recognized that the goal of the CWA - elimination of water pollution - cannot be achieved immediately.” Int'l Paper Co. v. Ouellette, 479 U.S. 481, 494, 107 S. Ct. 805, 93 L. Ed. 2d 883 (1987).
¶60 Further, Congress did not retain control over the specific terms of NPDES permits. Instead, Congress provided EPA with the authority to delegate the NPDES permit program to approved state agencies, with the requirement that state standards not fall below federal standards. 33 U.S.C. § 1370. This delegation suggests that Congress intended that the implementation of CWA objectives would occur within the framework of state law, not that it intended to preempt state law. Although the application of Washington’s vested rights doctrine may delay the application of Ecology’s current permit requirements for a limited number of developments, the doctrine itself does not prevent the accomplishment of Congress’s broad purposes and objectives.
*345 ¶61 Given the strong presumption against preemption under Washington law, we hold that that the CWA does not preempt Washington’s statutory vested rights doctrine.
¶62 We reverse the Board’s order and remand to the Board to direct Ecology to revise condition S5.C.5.a.iii in the 2013-2018 Permit to specify that the 2013-2018 Permit applies only to those completed applications submitted after July 1, 2015.
Lee, J., concurs.

 The Clean Water Act’s formal name is the Water Pollution Control Act. 33 U.S.C. §§ 1251-1388.

 The 2013-2018 Permit is the third Phase I municipal stormwater permit issued in Washington. Ecology issued the first such permit in 1995 and the second in 2007.

 The Board described MS4s as “all the conveyances or systems of conveyances that are designed or used for collecting or conveying stormwater, including roads with drainage systems, municipal streets, catch basins, curb gutters, ditches, manmade channels or storm drains.’’ Clerk’s Papers at 32-33.

 Ecology also regulates stormwater discharges from small municipalities with two Phase II permits. Neither of the Phase II permits are at issue in this appeal.

 The applicability of the 2013-2018 Permit’s minimum requirements depends on the development project’s type and size. Certain project types are expressly exempted from the 2013-2018 Permit’s requirements.

 The city of Seattle, city of Tacoma, and the Washington State Department of Transportation received permission to intervene in the appeals. Puget Sound-keeper Alliance, Washington Environmental Council, and Rosemere Neighborhood Association (collectively PSA) also received permission to intervene on behalf of Ecology.

 Ch. 90.48 RCW.

 A question exists as to whether the vested rights doctrine now is purely statutory or continues to evolve in the common law. The Supreme Court in Town of Woodway stated without discussion that “the vested rights doctrine is now statutory.’’ 180 Wn.2d at 173. Division One of this court also has held that the vested rights doctrine is purely statutory. Potala Vill. Kirkland, LLC v. City of Kirkland, 183 Wn. App. 191, 203-14, 334 P.3d 1143 (2014) (discussing the evolution of the vested rights doctrine and applying its holding that the doctrine is purely statutory). The appellants limit their arguments to the vested rights statutes, and none of the parties argue that we should address any common law vested rights doctrine. Therefore, we analyze only the vested rights statutes.

 Similarly, the Board ruled that Westside was inapplicable and adopted its prior discussion in Rosemere Neighborhood Ass’n v. Department of Ecology, No. 10-013, 2010 WL 3420570, at *2, 2010 WA ENV LEXIS 31, at *3-6 (Wash. Pollution Control Hr’gs Bd. Aug. 26, 2010).

 Ecology cites only to Citizens for Rational Shoreline Planning v. Whatcom County, 172 Wn.2d 384, 389, 258 P.3d 36 (2011) to support its argument. But that case involved RCW 82.02.020, which has explicit language stating that it applies only to taxes imposed by local government, not by the State. Citizens for Rational Shoreline Planning, 172 Wn.2d at 390. RCW 19.27.095(1) and RCW 58.17.033(1) have no similar language.

 Snohomish County also argues that compliance with condition S5.C.5.a.iii could require permittees to violate Washington’s doctrine of finality of land use decisions for land use applications actually approved before January 1, 2015. Because we reverse based on the vested rights doctrine, we do not address this issue.